# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued March 25, 2014        Decided July 22, 2014

No. 14-5018

JACQUELINE HALBIG, ET AL.,
APPELLANTS

v.

SYLVIA MATHEWS BURWELL, IN HER OFFICIAL CAPACITY AS
U.S. SECRETARY OF HEALTH AND HUMAN SERVICES, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:13-cv-00623)

*Michael A. Carvin* argued the cause for appellants. With him on the briefs were *Yaakov M. Roth* and *Jonathan Berry*.

*Rebecca A. Beynon*, *E. Scott Pruitt*, Attorney General, Office of the Attorney General for the State of Oklahoma, *Patrick R. Wyrick*, Solicitor General, *Luther Strange*, Attorney General, Office of the Attorney General for the State of Alabama, *Sam Olens*, Attorney General, Office of the Attorney General for the State of Georgia, *Patrick Morrisey*, Attorney General, Office of the Attorney General for the State of West Virginia, *Jon Bruning*, Attorney General, Office of the Attorney General for the State of Nebraska, and *Alan Wilson*, Attorney General, Office of the Attorney General for

the State of South Carolina were on the brief for *amici curiae* Consumer's Research, et al.

*C. Boyden Gray*, *Adam J. White*, and *Adam R.F. Gustafson* were on the brief for *amicus curiae* The Galen Institute in support of appellants.

*Charles J. Cooper*, *David H. Thompson*, *Howard C. Nielson*, and *Michael E. Roman* were on the brief for *amici curiae* Senator John Cornyn, et al. in support of appellants.

*John R. Woodrum* was on the brief for *amicus curiae* National Federation of Independent Business Legal Center in support of appellants.

*Bert W. Rein*, *William S. Consovoy*, *John M. Connolly*, and *Ilya Shapiro* were on the brief for *amici curiae* Pacific Research Institute, et al. in support of appellants.

*Derek Schmidt*, Attorney General, Office of the Attorney General for the State of Kansas, *Jeffrey A. Chanay*, Deputy Attorney General, *Stephen R. McAllister*, Solicitor General, *Bryan C. Clark*, Assistant Solicitor General, *Bill Schuette*, Attorney General, Office of the Attorney General for the State of Michigan, and *Jon Bruning*, Attorney General, Office of the Attorney General for the State of Nebraska, were on the brief for *amici curiae* States of Kansas, et al. in support of appellants.

*Andrew M. Grossman* was on the brief for *amici curiae* Jonathan Adler, et al. in support of appellants.

*Stuart F. Delery*, Assistant Attorney General, U.S. Department of Justice, argued the cause for appellees. With him on the brief were *Ronald C. Machen*, *Jr.*, U.S. Attorney,

*Beth S. Brinkmann*, Deputy Assistant Attorney General, and *Mark B. Stern* and *Alisa B. Klein*, Attorneys.

*Martha Jane Perkins*, *Kelly Bagby*, *Iris Y. Gonzalez*, and *Michael Schuster* were on the brief for *amici curiae* AARP and National Health Law Program in support of appellees.

*Mary P. Rouvelas* was on the brief for *amici curiae* The American Cancer Society, et al. in support of appellees.

*H. Guy Collier* and *Ankur J. Goel* were on the brief for *amici curiae* Public Health Deans, Chairs, and Faculty in support of appellees.

*Elizabeth B. Wydra* and *Simon Lazarus* were on the brief for *amici curiae* Members of Congress and State Legislatures in support of appellees.

*Dominic F. Perella*, *Sean Marotta*, and *Melinda Reid Hatton* were on the brief for *amicus curiae* The American Hospital Association in support of appellees.

*Andrew J. Pincus* and *Brian D. Netter* were on the brief for *amicus curiae* America's Health Insurance Plans in support of appellees.

*Matthew S. Hellman* and *Matthew E. Price* were on the brief for *amici curiae* Economic Scholars in support of appellees.

*Robert Weiner* and *Murad Hussain* were on the brief for *amicus curiae* Families USA in support of appellees.

Before: GRIFFITH, *Circuit Judge*, and EDWARDS and RANDOLPH, *Senior Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GRIFFITH.

Concurring opinion filed by *Senior Circuit Judge* RANDOLPH.

Dissenting opinion filed by *Senior Circuit Judge* EDWARDS.

GRIFFITH, *Circuit Judge*: Section 36B of the Internal Revenue Code, enacted as part of the Patient Protection and Affordable Care Act (ACA or the Act), makes tax credits available as a form of subsidy to individuals who purchase health insurance through marketplaces—known as "American Health Benefit Exchanges," or "Exchanges" for short—that are "established by the State under section 1311" of the Act. 26 U.S.C. § 36B(c)(2)(A)(i). On its face, this provision authorizes tax credits for insurance purchased on an Exchange established by one of the fifty states or the District of Columbia. *See* 42 U.S.C. § 18024(d). But the Internal Revenue Service has interpreted section 36B broadly to authorize the subsidy also for insurance purchased on an Exchange established by the federal government under section 1321 of the Act. *See* 26 C.F.R. § 1.36B-2(a)(1) (hereinafter "IRS Rule").

Appellants are a group of individuals and employers residing in states that did not establish Exchanges. For reasons we explain more fully below, the IRS's interpretation of section 36B makes them subject to certain penalties under the ACA that they would rather not face. Believing that the IRS's interpretation is inconsistent with section 36B, appellants challenge the regulation under the Administrative Procedure Act (APA), alleging that it is not "in accordance with law." 5 U.S.C. § 706(2)(A).

On cross-motions for summary judgment, the district court rejected that challenge, granting the government's motion and denying appellants'. *See Halbig v. Sebelius*, No. 13 Civ. 623 (PLF), 2014 WL 129023 (D.D.C. Jan. 15, 2014). After resolving several threshold issues related to its jurisdiction, the district court held that the ACA's text, structure, purpose, and legislative history make "clear that Congress intended to make premium tax credits available on both state-run and federally-facilitated Exchanges." *Id.* at *18. Furthermore, the court held that even if the ACA were ambiguous, the IRS's regulation would represent a permissible construction entitled to deference under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).

Appellants timely appealed the district court's orders, and we have jurisdiction under 28 U.S.C. § 1291. Our review of the orders is de novo, and "[o]n an independent review of the record, we will uphold an agency action unless we find it to be 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Holland v. Nat'l Mining Ass'n*, 309 F.3d 808, 814 (D.C. Cir. 2002) (quoting 5 U.S.C. § 706(2)(A)). Because we conclude that the ACA unambiguously restricts the section 36B subsidy to insurance purchased on Exchanges "established by the State," we reverse the district court and vacate the IRS's regulation.

I

Congress enacted the Patient Protection and Affordable Care Act in 2010 "to increase the number of Americans covered by health insurance and decrease the cost of health care." *Nat'l Fed'n of Indep. Bus. v. Sebelius* (*NFIB*), 132 S. Ct. 2566, 2580 (2012). The ACA pursues these goals through

a complex network of interconnected policies focused primarily on helping individuals who do not receive coverage through an employer or government program to purchase affordable insurance directly. Central to this effort are the Exchanges. 42 U.S.C. § 18031(b)(1). Exchanges are "governmental agenc[ies] or nonprofit entit[ies]" that serve as both gatekeepers and gateways to health insurance coverage. *See id.* § 18031(d)(1). Among their many functions as gatekeepers, Exchanges determine which health plans satisfy federal and state standards, and they operate websites that allow individuals and employers to enroll in those that do. *See id.* § 18031(b)(1), (d)(1)-(d)(4). Section 1311 of the ACA delegates primary responsibility for establishing Exchanges to individual states. *See id.* § 18031(b)(1) (providing that "[e]ach State shall, not later than January 1, 2014, establish an American Health Benefit Exchange (referred to in this title as an 'Exchange') for the State"). However, because Congress cannot require states to implement federal laws, *see Printz v. United States*, 521 U.S. 898, 904-05, 935 (1997), if a state refuses or is unable to set up an Exchange, section 1321 provides that the federal government, through the Secretary of Health and Human Services (HHS), "shall . . . establish and operate such Exchange within the State." 42 U.S.C. § 18041(c)(1). As of today, only fourteen states and the District of Columbia have established Exchanges. The federal government has established Exchanges in the remaining thirty-six states, in some cases with state assistance but in most cases not. *See* Richard Cauchi, *State Actions To Address Health Insurance Exchanges*, NAT'L CONFERENCE OF STATE LEGISLATURES (May 9, 2014), http://www.ncsl.org/research/health/state-actions-to-implement-the-health-benefit.aspx.

Under section 36B, Exchanges also serve as the gateway to the refundable tax credits through which the ACA

subsidizes health insurance. *See* 26 U.S.C. § 36B(a). Generally speaking, section 36B authorizes credits for "applicable taxpayer[s]," *id.*, defined as those with household incomes between 100 and 400 percent of the federal poverty line, *id.* § 36B(c)(1)(A). But section 36B's formula for calculating the credit works further limits on who may receive the subsidy. According to that formula, the credit is to equal the sum of the "premium assistance amounts" for each "coverage month." *Id.* § 36B(b)(1). The "premium assistance amount" is based on the cost of a "qualified health plan . . . enrolled in through an Exchange established by the State under [section] 1311 of the [ACA]." *Id.* § 36B(b)(2); *see also* 42 U.S.C. §§ 18021(a)(1), 18031(c)(1) (establishing requirements for "qualified health plans"). Likewise, a "coverage month" is a month for which, "as of the first day of such month the taxpayer . . . is covered by a qualified health plan . . . that was enrolled in through an Exchange established by the State under section 1311 of the [ACA]." 26 U.S.C. § 36B(c)(2)(A)(i). In other words, the tax credit is available only to subsidize the purchase of insurance on an "Exchange established by the State under section 1311 of the [ACA]."

But, in a regulation promulgated on May 23, 2012, the IRS interpreted section 36B to allow credits for insurance purchased on either a state- or federally-established Exchange. Specifically, the regulation provided that a taxpayer may receive a tax credit if he "is enrolled in one or more qualified health plans through an Exchange," 26 C.F.R. § 1.36B-2(a)(1), which the IRS defined as "an Exchange serving the individual market for qualified individuals . . . , *regardless of whether the Exchange is established and operated by a State (including a regional Exchange or subsidiary Exchange) or by HHS.*" 45 C.F.R. § 155.20 (emphasis added); *see* 26 C.F.R. § 1.36B-1(k) (incorporating the definition in 45 C.F.R. § 155.20 by reference). In

promulgating this broader rule, the IRS acknowledged that "[c]ommentators disagreed on whether the language in section 36B(b)(2)(A) limits the availability of the premium tax credit only to taxpayers who enroll in qualified health plans on State Exchanges," but asserted without elaboration that "[t]he statutory language of section 36B and other provisions of the [ACA]," as well as "the relevant legislative history," supported its view. Health Insurance Premium Tax Credit, 77 Fed. Reg. 30,377, 30,378 (May 23, 2012).

This broader interpretation has major ramifications. By making credits more widely available, the IRS Rule gives the individual and employer mandates—key provisions of the ACA—broader effect than they would have if credits were limited to state-established Exchanges. The individual mandate requires individuals to maintain "minimum essential coverage" and, in general, enforces that requirement with a penalty. *See* 26 U.S.C. § 5000A(a)-(b). The penalty does not apply, however, to individuals for whom the annual cost of the cheapest available coverage, *less any tax credits*, would exceed eight percent of their projected household income. *See id.* § 5000A(e)(1)(A)-(B). By some estimates, credits will determine on which side of the eight-percent threshold millions of individuals fall. *See* Br. of Economic Scholars in Support of Appellees 18. Thus, by making tax credits available in the 36 states with federal Exchanges, the IRS Rule significantly increases the number of people who must purchase health insurance or face a penalty.

The IRS Rule affects the employer mandate in a similar way. Like the individual mandate, the employer mandate uses the threat of penalties to induce large employers—defined as those with at least 50 employees, *see* 26 U.S.C. § 4980H(c)(2)(A)—to provide their full-time employees with health insurance. *See generally id.* § 4980H(a). Specifically,

the ACA penalizes any large employer who fails to offer its full-time employees suitable coverage *if* one or more of those employees "enroll[s] . . . in a qualified health plan with respect to which an applicable tax credit . . . is allowed or paid with respect to the employee." *Id.* § 4980H(a)(2); *see also id.* § 4980H(b) (linking another penalty on employers to employees' receipt of tax credits). Thus, even more than with the individual mandate, the employer mandate's penalties hinge on the availability of credits. If credits were unavailable in states with federal Exchanges, employers there would face no penalties for failing to offer coverage. The IRS Rule has the opposite effect: by allowing credits in such states, it exposes employers there to penalties and thereby gives the employer mandate broader reach.

## II

Before we can turn to the merits of the parties' dispute, we must first address the government's argument that all appellants lack standing and that, even if they have standing, the APA does not provide them with a cause of action to challenge the IRS Rule. Because we find that appellant David Klemencic has standing and a cause of action under the APA, we do not reach the issue of our jurisdiction over the remaining appellants' claims. *See Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1232 (D.C. Cir. 1996) (explaining that as long as one plaintiff has standing for a claim, "we need not consider the standing of the other plaintiffs to raise that claim").

## A

The "'irreducible constitutional minimum'" a plaintiff must show to establish standing is (1) an injury in fact (2) fairly traceable to the alleged conduct of the defendant

(3) that is likely to be redressed by the relief the plaintiff seeks. *Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269, 273-74 (2008) (quoting *Lujan v. Defenders of Wildlife*, 405 U.S. 555, 560-61 (1992)). The district court determined that at least one of the appellants, David Klemencic, has standing. Klemencic resides in West Virginia, a state that did not establish its own Exchange, and expects to earn approximately $20,000 this year.[1] He avers that he does not wish to purchase health insurance and that, but for federal credits, he would be exempt from the individual mandate because the unsubsidized cost of coverage would exceed eight percent of his income. The availability of credits on West Virginia's federal Exchange therefore confronts Klemencic with a choice he'd rather avoid: purchase health insurance at a subsidized cost of less than $21 per year or pay a somewhat greater tax penalty.

The government primarily questions whether Klemencic has suffered an injury in fact. An injury in fact is "a concrete and particularized invasion of a legally protected interest." *Sprint Commc'ns Co.*, 554 U.S. at 273 (internal quotation marks omitted). The government characterizes Klemencic's injury as purely ideological and hence neither concrete nor particularized. But, although Klemencic admits to being at

---

[1] Although West Virginia actually passed legislation authorizing the establishment of an Exchange, *see* W. VA. CODE § 33-16G-1 *et seq.*, it subsequently decided to allow the federal government to establish the Exchange, in partnership with the state, due to cost concerns, *see* Nat'l Conference of State Legislatures: Health Insurance Exchanges or Marketplaces: State Action—May 2014, http://www.ncsl.org/Portals/1/Documents/Health/Health_Insurance_Exchanges_State_Profiles.pdf#page=49 (last visited June 12, 2014).

least partly motivated by opposition to "government handouts," he has established that, by making subsidies available in West Virginia, the IRS Rule will have quantifiable economic consequences particular to him. *See Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1147 (2013) (explaining that a "threatened injury" that is "certainly impending" may "constitute injury in fact" (emphasis and internal quotation marks omitted)). Those consequences may be small, but even an "'identifiable trifle'" of harm may establish standing. *Chevron Natural Gas v. FERC*, 199 F. App'x 2, 4 (D.C. Cir. 2006) (quoting *United States v. Students Challenging Regulatory Agency Procedures*, 412 U.S. 669, 689 n.14 (1973)); *see Bob Jones Univ. v. United States*, 461 U.S. 574, 581-82 (1983) (noting that Bob Jones University sued for a tax refund of $21.00). Klemencic thus satisfies the requirement of establishing an injury in fact, and because that injury is traceable to the IRS Rule and redressable through a judicial decision invalidating the rule, we find that he has standing to challenge the rule. We therefore proceed to consider whether Klemencic may mount his challenge under the APA.

B

The APA provides a cause of action to challenge final agency action "for which there is no other adequate remedy in a court." 5 U.S.C. § 704. The government argues that even if Klemencic has standing to challenge the IRS Rule, he cannot do so under the APA because he has an adequate alternative remedy in the form of a tax-refund suit: Klemencic could violate the individual mandate, pay the penalty, and then sue for a refund, raising the same arguments he makes here. *See* 28 U.S.C. § 1346(a)(1); *see also* 26 U.S.C. § 7422(a). Such a remedy is adequate, the government contends, because if

Klemencic were successful, the suit would make him financially whole.

The APA "embodies the basic presumption of judicial review" of agency action. *Abbott Labs. v. Gardner*, 387 U.S. 136, 140 (1967). Therefore, in determining whether an alternative remedy is adequate, we must give the APA's "generous review provisions" a "hospitable interpretation," such that "only upon a showing of clear and convincing evidence of a contrary legislative intent should the courts restrict access to judicial review." *Id.* at 141 (internal quotation marks omitted); *see Garcia v. Vilsack*, 563 F.3d 519, 523 (D.C. Cir. 2009). Under this standard, "[a]n alternative remedy will not be adequate . . . if the remedy offers only 'doubtful and limited relief.'" *Garcia*, 563 F.3d at 522 (quoting *Bowen v. Massachusetts*, 487 U.S. 879, 901 (1988)). Although "the alternative remedy need not provide relief identical to relief under the APA," it must "offer[] relief of the 'same genre.'" *Id.* at 522 (quoting *El Rio Santa Cruz Neighborhood Health Ctr. v. U.S. Dep't of Health & Human Servs.*, 396 F.3d 1265, 1272 (D.C. Cir. 2005)).

In arguing that a tax refund suit provides an adequate alternative remedy, the government emphasizes Klemencic's ability to recover any assessed overpayment, plus interest. But that backward-looking relief differs in kind from the prospective relief Klemencic could obtain under the APA. *See Bowen*, 487 U.S. at 904-05 (rejecting as "unprecedented" the government's argument that a suit for monetary damages is an adequate alternative to prospective relief under the APA). Specifically, requiring Klemencic to proceed via refund suit would deprive him of the opportunity to obtain a "certificate of exemption." *See* 45 C.F.R. § 155.605(g)(2). Such certificates are a form of safe harbor, allowing an individual to obtain an exemption from the mandate's penalty on the

basis of projected income, "notwithstanding any [subsequent] change in an individual's circumstances." *Id.* § 155.605(g)(2)(vi). Unlike the "prospective[]" assurance such certificates offer, *id.*, a refund suit would require Klemencic to violate the law as it now stands, pay a penalty, and only then challenge the assessment of the penalty for that previous year based on his actual income. And even if Klemencic were to prevail, his relief—financial restitution— would be backwards looking, meaning that Klemencic would have to repeat the cycle the following year. The government offers no suggestion that he could obtain a certificate of exemption through a refund action.

Furthermore, it is not clear that Klemencic could obtain any prospective relief through a refund action, let alone that which he seeks under his APA claim—namely, a declaration that the IRS Rule is invalid and an injunction barring its implementation. As we explained in *Cohen v. United States*, the provision authorizing refund suits "does not, at least explicitly, allow for prospective relief." 650 F.3d 717, 732 (D.C. Cir. 2011) (en banc); *see* 26 U.S.C. § 7422(a) (setting forth requirements applicable to any "suit or proceeding . . . for the *recovery* . . . of any penalty claimed to have been collected without authority" (emphasis added)). And the government here does not suggest that it implicitly allows such relief, maintaining instead the studied silence as to the availability of non-monetary relief that, in *Cohen*, we interpreted as a concession of the limited nature of the remedies a refund suit under section 7422 offers. *See Cohen*, 650 F.3d at 732. (noting that, by being "agnostic concerning the availability of broad equitable remedies as part of a refund suit," the IRS "unknowingly concedes" that an action under section 7422 does not offer prospective relief). We must therefore conclude that a tax refund suit is inadequate as an alternative remedy: it is "doubtful" that it offers prospective

relief at all, and the monetary relief it does offer is clearly not "of the same genre" as the relief available to appellants under the APA. *See Garcia*, 563 F.3d at 522 (internal quotation marks omitted). Because a tax refund suit thus offers Klemencic only "doubtful and limited relief," *Bowen*, 487 U.S. at 901, we hold that the APA provides him with a cause of action to challenge the IRS Rule and turn to the merits of his claim.

III

On the merits, this case requires us to determine whether the ACA permits the IRS to provide tax credits for insurance purchased through federal Exchanges. To make this determination, we begin by asking "whether Congress has directly spoken to the precise question at issue," for if it has, we must give effect to its unambiguously expressed intent. *Chevron U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S. 837, 842-43 (1984). The text of section 36B is only the starting point of this analysis. That provision is but one piece of a vast, complex statutory scheme, and we must consider it both on its own and in relation to the ACA's interconnected provisions and overall structure so as to interpret the Act, if possible, "as a symmetrical and coherent scheme." *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (internal quotation marks omitted); *Wolf Run Mining Co. v. Fed. Mine Safety & Health Review Comm'n*, 659 F.3d 1197, 1200 (D.C. Cir. 2011).

Although both appellants and the government argue that the ACA, read in its totality, evinces clear congressional intent, they dispute what that intent actually is. Appellants argue that if taxpayers can receive credits only for plans enrolled in "through an Exchange established by the State under section 1311 of the [ACA]," then the IRS clearly

cannot give credits to taxpayers who purchased insurance on an Exchange established by the federal government. After all, the federal government is not a "State," *see* 42 U.S.C. § 18024(d) (defining "State" to "mean[] each of the 50 States and the District of Columbia"), and its authority to establish Exchanges appears in section 1321 rather than section 1311, *see id.* § 18041(c)(1). The government counters that appellants take a blinkered view of the ACA and that sections 1311 and 1321 of the Act establish complete equivalence between state and federal Exchanges, such that when the federal government establishes an Exchange, it does so standing in the state's shoes. Furthermore, the government argues, whereas appellants' construction of section 36B renders other provisions of the ACA absurd, its own view brings coherence to the statute and better promotes the purpose of the Act.

We conclude that appellants have the better of the argument: a federal Exchange is not an "Exchange established by the State," and section 36B does not authorize the IRS to provide tax credits for insurance purchased on federal Exchanges. We reach this conclusion by the following path: First, we examine section 36B in light of sections 1311 and 1321, which authorize the establishment of state and federal Exchanges, respectively, and conclude that section 36B plainly distinguishes Exchanges established by states from those established by the federal government. We then consider the government's arguments that this construction generates absurd results but find that it does not render other provisions of the ACA unworkable, let alone so unreasonable as to justify disregarding section 36B's plain meaning. Finally, turning to the ACA's purpose and legislative history, we find that the government again comes up short in its efforts to overcome the statutory text. Its appeals to the ACA's broad aims do not demonstrate that Congress

manifestly meant something other than what section 36B says.

A

The crux of this case is whether an Exchange established by the federal government is an "Exchange established by the State under section 1311 of the [ACA]." We therefore begin with the provisions authorizing states and the federal government to establish Exchanges. Section 1311 provides that states "shall" establish Exchanges. 42 U.S.C. § 18031(b)(1). But, as the parties agree, despite its seemingly mandatory language, section 1311 more cajoles than commands. A state is not literally required to establish an Exchange; the ACA merely encourages it to do so. And if a state elects not to (or is unable to), such that it "will not have any required Exchange operational by January 1, 2014," section 1321 directs the federal government, through the Secretary of Health and Human Services, to "establish and operate *such Exchange* within the State." *Id.* § 18041(c)(1) (emphasis added).

The phrase "such Exchange" has twofold significance. First, the word "such"—meaning "aforementioned," *see* BLACK'S LAW DICTIONARY 1473 (8th ed. 2004); WEBSTER'S THIRD INT'L DICTIONARY 2283 (1981)—signifies that the Exchange the Secretary must establish is the "required Exchange" that the state failed to establish. In other words, "such" conveys what a federal Exchange is: the equivalent of the Exchange a state would have established had it elected to do so. The meaning of "Exchange" in the ACA reinforces and builds on this sense. The ACA defines an "Exchange" as "an American Health Benefit Exchange established under [section 1311 of the ACA]." 42 U.S.C. § 300gg-91(d)(21). If we import that definition into the text of section 1321, the

provision directs the Secretary to "establish . . . such American Health Benefit Exchange established under [section 1311 of the ACA] within the State." This suggests not only that the Secretary is to establish the type of exchange described in section 1311, but also that when she does so, she acts under section 1311, even though her authority appears in section 1321. Thus, section 1321 creates equivalence between state and federal Exchanges in two respects: in terms of what they are and the statutory authority under which they are established.

The problem confronting the IRS Rule is that subsidies also turn on a third attribute of Exchanges: who established them. Under section 36B, subsidies are available only for plans "enrolled in through an Exchange *established by the State* under section 1311 of the [ACA]." 26 U.S.C. § 36B(c)(2)(A)(i) (emphasis added); *see also id.* § 36B(b)(2)(A). Of the three elements of that provision— (1) an Exchange (2) established by the State (3) under section 1311—federal Exchanges satisfy only two: they are Exchanges established under section 1311. Nothing in section 1321 deems federally-established Exchanges to be "Exchange[s] established by the State." This omission is particularly significant since Congress knew how to provide that a non-state entity should be treated as if it were a state when it sets up an Exchange. In a nearby section, the ACA provides that a U.S. territory that "elects . . . to establish an Exchange . . . shall be treated as a State."[2] 42 U.S.C. § 18043(a)(1). The absence of similar language in section

---

[2] Specifically, the ACA permits territories to be treated as states for the limited purposes of sections 1311, 1312, and 1313. *See* 42 U.S.C. § 18043(a).

1321 suggests that even though the federal government may establish an Exchange "within the State," it does not in fact stand in the state's shoes when doing so. *See NFIB*, 132 S. Ct. at 2583 ("Where Congress uses certain language in one part of a statute and different language in another, it is generally presumed that Congress acts intentionally." (citing *Russello v. United States*, 464 U.S. 16, 23 (1983))).

The dissent attempts to supply this missing equivalency by pointing to section 1311(d)(1), which provides: "An Exchange shall be a governmental agency or nonprofit entity that is established by a State." 42 U.S.C. § 18031(d)(1). According to the dissent, (d)(1) means that an Exchange established under section 1311 is, by definition, established by a state. Therefore, the dissent argues, because federal Exchanges are established under section 1311, they too, by definition, are established by a state.

The premise that (d)(1) is definitional, however, does not survive examination of (d)(1)'s context and the ACA's structure. The other provisions of section 1311(d) are operational requirements, setting forth what Exchanges must (or, in some cases, may) do.[3] *See generally* 42 U.S.C. § 18031(d)(2)-(7) (listing "[r]equirements"). Read in keeping

---

[3] Although we attach little weight to section titles, the title of section 1321(c)—"Failure to establish Exchange or implement requirements"—reinforces this interpretation. *See Gorman v. Nat'l Transp. Safety Bd.*, 558 F.3d 580, 588 n.5 (D.C. Cir. 2009) (recognizing that "headings 'are of use . . . when they shed light on some ambiguous word or phrase'" (ellipsis in original) (quoting *Bhd. of R.R. Trainmen v. Balt. & O. R. Co.*, 331 U.S. 519, 529 (1947))).

with that theme, (d)(1) would simply require that an Exchange operate as either a governmental agency or nonprofit entity. But the dissent would have us construe (d)(1) differently. In its view, (d)(1) plays a definitional role unique among section 1311(d)'s otherwise operational provisions, creating a legal fiction that any Exchange is, by definition, established by a state, even when, as a matter of fact, it is not. That reading, however, would render (d)(1) the odd man out twice over: both within section 1311(d) and among the ACA's other definitional provisions, which, unlike (d)(1), employ the (unmistakably definitional) formula of "The term 'X' means . . . ." *See, e.g.*, 42 U.S.C. §§ 300gg-91, 18024; *see also* 26 U.S.C. § 4980H(c).

The dissent's reading would also require us to overlook the fact that section 1311(d) would be a strange place for Congress to have buried such a legal fiction. Section 1311, after all, concerns Exchanges that are established by states *in fact*; the legal fiction the dissent urges would matter only to Exchanges established by the federal government. To accept the dissent's construction would therefore transform (d)(1) into the proverbial elephant in the mousehole—the "ancillary provision[]" that "alter[s] the fundamental details of a regulatory scheme." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). The Supreme Court has repeatedly held that Congress does not legislate in this manner, *see id.*; *accord Gonzales v. Oregon*, 546 U.S. 243, 267 (2006), and we see no evidence that it did so here.[4] Indeed, we are particularly loath

---

[4] The government makes its own elephants-in-mouseholes argument, asserting that the formula for calculating tax credits (located in section 36B(b)) is an odd place to insert a condition that the states must establish their own Exchanges if they wish to secure tax credits for their citizens. The more natural location, the

to accept the dissent's construction given that there are far more natural locations to place this fiction, such as section 1321 or the provision defining the term "Exchange," 42 U.S.C. § 300gg-91(d)(21).

The dissent's construction of (d)(1) also ignores the structural relationship between sections 1311 and 1321. Just as section 1311(b)(1) assumes that states will establish Exchanges in general, *see* 42 U.S.C. § 18031(b)(1), section

---

government suggests, would have been section 36B(a), which authorizes the credit in the first place. *See* 26 U.S.C. § 36B(a). But even under the government's reading of section 36B(b), the statutory formula houses an elephant: namely, the rule that subsidies are only available for plans purchased through Exchanges. Given that this other crucial limitation on the availability of subsidies is found only in section 36B's formula, the government's contention that the formula is a mere mousehole is unpersuasive.

Equally unpersuasive is the dissent's suggestion that section 36B cannot mean what it plainly says because Congress did not use an "if/then" formula to signify that credits are available only on state-established Exchanges. The dissent cites no authority for requiring such magic words, and we perceive none. Section 36B(b) also does not employ an "if/then" construction for the requirement that credit-eligible coverage be purchased through an Exchange, yet neither the government nor dissent disputes that requirement. It is simply not the case that Congress expresses conditions only through such language. Indeed, in 26 U.S.C. § 35, which establishes a tax credit to offset the cost of health insurance for certain workers displaced by foreign competition, Congress made the availability of the credit turn, in part, on state cooperation without employing "if/then" language, simply through its definition of the phrase "eligible coverage month." *See* 26 U.S.C. § 35(e)(2)(A).

1311(d) assumes that states will carry out the specific requirements Exchanges must meet. But if those assumptions prove wrong, section 1321 assigns the federal government responsibility both to establish the Exchange and to ensure that it satisfies the particulars of section 1311(d). *See id.* § 18041(c) (directing the Secretary to "establish and operate such Exchange" *and* to "take such actions as are necessary to implement such other requirements" pertaining to Exchanges). In other words, section 1321 creates a limited scheme of substitution: the requirements assigned to states by 1311(d) are transferred to the federal government if a state fails to establish an Exchange. The specific requirement that (d)(1) assumes each state will fulfill is to establish an Exchange in the form of "a governmental agency or nonprofit entity." So if a state elects not to participate in the creation of an Exchange, section 1321 directs the federal government that *it* must create "a governmental agency or nonprofit entity" to serve as the Exchange. Crucially, this construction does not entail ignoring the plain meaning of "established by a State" in section 1311(d)(1); here, section 1321 *tells* us to substitute the federal government for the state under a certain scenario. But there is nothing comparable with respect to section 36B: no analogue to section 1321 says that section 36B should be read to encompass federally-established Exchanges. Accordingly, we reject the dissent's argument that, because federal Exchanges are established under section 1311, they are by definition "established by a State."

Instead, sections 1311 and 1321 lead us to interpret section 36B essentially as appellants do. Those provisions, to be sure, establish some degree of equivalence between state and federal Exchanges—enough, indeed, that if section 36B had authorized credits for insurance purchased on an "Exchange established under section 1311," the IRS Rule would stand. But section 36B actually authorizes credits only

for coverage purchased on an "Exchange *established by the State* under section 1311," 26 U.S.C. § 36B(c)(2)(A)(i), and the government offers no textual basis—in sections 1311 and 1321 or elsewhere—for concluding that a federally-established Exchange is, in fact or legal fiction, established by a state. Moreover, as we have noted, that absence is especially glaring given that the ACA elsewhere provides that a federal territory that establishes an Exchange "shall be treated as a State," 42 U.S.C. § 18043(a), clearly demonstrating that Congress knew how to deem a non-state entity to be a "State." Thus, at least in light of sections 1311 and 1321, the meaning of section 36B appears plain: a federal Exchange is not an "Exchange established by the State."

B

The government argues that we should not adopt the plain meaning of section 36B, however, because doing so would render several other provisions of the ACA absurd. Our obligation to avoid adopting statutory constructions with absurd results is well-established. *See Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 454-55 (1989). Under this principle, we will not give effect to a statute's literal meaning when doing so would "render[ the] statute nonsensical or superfluous or . . . create[] an outcome so contrary to perceived social values that Congress could not have intended it." *United States v. Cook*, 594 F.3d 883, 891 (D.C. Cir. 2010) (internal quotation marks omitted). But we do not disregard statutory text lightly. The Constitution assigns the legislative power to Congress, and Congress alone, *see* U.S. CONST. art. I, § 1, and legislating often entails compromises that courts must respect. *See Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 461 (2002). *See generally* John F. Manning, *The Absurdity Doctrine*, 116 HARV. L. REV. 2387, 2434-2435 (2003) (warning that an overbroad application of the absurdity

doctrine "contradicts the rule-of-law objectives implicit in the Constitution's strict separation of lawmaking from judging"). We therefore give the absurdity principle a narrow domain, insisting that a given construction cross a "high threshold" of unreasonableness before we conclude that a statute does not mean what it says. *Cook*, 594 F.3d at 891. A provision thus "may seem odd" without being "absurd," and in such instances "it is up to Congress rather than the courts to fix it," even if it "may have been an unintentional drafting gap." *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 565 (2005) (internal quotation marks omitted); *see also Sierra Club v. EPA*, 294 F.3d 155, 161 (D.C. Cir. 2002) ("Because our role is not to 'correct' the text so that it better serves the statute's purposes, we will not ratify an interpretation that abrogates the enacted statutory text absent an extraordinarily convincing justification." (internal quotation marks and citation omitted)).

i

The government first argues that we must uphold the IRS Rule to avoid rendering language in 26 U.S.C. § 36B(f) superfluous. Titled "Reconciliation of credit and advance credit," section 36B(f) requires the IRS to reduce a taxpayer's end-of-year credit by the amount of any advance payments made by the government to the taxpayer's insurer to offset the cost of monthly premiums. *Id.* § 36B(f)(1); *see* 42 U.S.C. § 18082(c)(2)(A) (authorizing such advance payments). As relevant here, section 36B(f) also requires "each Exchange"— *i.e.*, both state and federal Exchanges—to report certain information to the government. With respect to any health plan it provides, an Exchange must report:

(A) The level of coverage . . . and the period such coverage was in effect.

(B) The total premium for the coverage without regard to the credit under this section or cost-sharing reductions under section 1402 of [the ACA].

(C) The aggregate amount of any advance payment of such credit or reductions . . . .

(D) The name, address, and [taxpayer identification number (TIN)] of the primary insured and the name and TIN of each other individual obtaining coverage under the policy.

(E) Any information provided to the Exchange, including any change of circumstances, necessary to determine eligibility for, and the amount of, such credit.

(F) Information necessary to determine whether a taxpayer has received excess advance payments.

26 U.S.C. § 36B(f)(3). The government contends that these reporting requirements assume that credits are available on federal Exchanges, and it argues that the requirements would be superfluous, even nonsensical, as applied to federal Exchanges if we were to reject that assumption.

Not so. Even if credits are unavailable on federal Exchanges, reporting by those Exchanges still serves the purpose of enforcing the individual mandate—a point the IRS, in fact, acknowledged in promulgating a recent regulation, 26 C.F.R. § 1.6055-1(d)(1). That regulation exempts insurers from 26 U.S.C. § 6055, which otherwise would require that, for each policy they issue, insurers report to the IRS such information as "the name, address, and TIN of the primary insured," the dates of coverage, and the "amount (if any) or any advance payment . . . or of any premium tax credit under section 36B with respect to such coverage." 26 U.S.C. § 6055(b)(1)(B). The IRS justified the exemption for insurers on the ground that "Exchanges must report on this coverage under section 36B(f)(3)." Information Reporting of

Minimum Essential Coverage, 79 Fed. Reg. 13,220, 13,221 (Mar. 10, 2014); *see* 26 C.F.R. § 1.6055-1(d)(1).[5] The government's claim that section 36B(f)(3)'s reporting requirement serves no purpose other than reconciling credits is therefore simply not true.[6]

Furthermore, holding that credits are unavailable on federal Exchanges would not convert the specific reporting requirements concerning credits into an "'empty gesture.'" Gov't Br. 28 (quoting *Fund for Animals, Inc. v. Kempthorne*, 472 F.3d 872, 878 (D.C. Cir. 2006)). Those requirements would still allow the reconciling of credits on state Exchanges; as applied to federal Exchanges, they would simply be over-inclusive. Over-inclusiveness, however, remains a problem even if we were to agree that section 36B allows credits on federal Exchanges. Section 36B(f)(3), after all, mandates reporting "with respect to *any* health plan provided through the Exchange," 26 U.S.C. § 36B(f)(3) (emphasis added), even though only plans purchased by taxpayers with incomes between 100 and 400 percent of the federal poverty line may be subsidized, *see id.* § 36B(a),

---

[5] Appellants also suggest that the information collected from federal Exchanges could be useful for the "Study on Affordable Coverage" mandated by the ACA in that same section. *See* ACA § 1401(c), 124 Stat. at 220.

[6] The dissent takes a slightly different tack, emphasizing that the "*principal* purpose" of the reporting requirement is to reconcile advance and end-of-year payments. Dissenting Op. at 22. We agree but fail to see how this helps the government. Reporting by state-established Exchanges still would serve this purpose, while reporting by federally-established Exchanges would serve the secondary purpose implicitly recognized by 26 C.F.R. § 1.6055-1(d)(1).

(c)(1)(A). A weakness common to both views of the availability of credits hardly serves as a basis for choosing between them.

ii

The government next points to the supposedly absurd consequences appellants' interpretation of section 36B would have for section 1312 of the ACA, which defines the rights of "qualified individuals." *See* 42 U.S.C. § 18032. The term "'qualified individual' means, with respect to an Exchange, an individual who— (i) is seeking to enroll in a qualified health plan in the individual market offered through the Exchange; and (ii) resides in the State that established the Exchange." *Id.* § 18032(f)(1)(A). If this provision is given its plain meaning, then the 36 states with federal Exchanges (that, obviously, the states did not establish) have no qualified individuals. That outcome is absurd, the government argues, because in its view section 1312 restricts access to Exchanges to qualified individuals alone. *See* 45 C.F.R. § 155.20. The absence of qualified individuals would mean that federal Exchanges have no customers and therefore no purpose. The government urges us to avoid this outcome by construing section 1321 to authorize the federal government to establish Exchanges "*on behalf of*" states that decline to do so. Gov't Br. 21 (internal quotation marks omitted).

The government, however, tilts at windmills. It assumes that when section 1312(a) states that "[a] qualified individual may enroll in any qualified health plan available to such individual and for which such individual is eligible," 42 U.S.C. § 18032(a)(1), it means that *only* a qualified individual may enroll in such a plan. The obvious flaw in this interpretation is that the word "only" does not appear in the provision. We have repeatedly emphasized that it is "not our

role" to "engage in a statutory rewrite" by "insert[ing] the word 'only' here and there." *Adirondack Med. Ctr. v. Sebelius*, 740 F.3d 692, 699-700 (D.C. Cir. 2014); *see Lamie v. U.S. Tr.*, 540 U.S. 526, 538 (2004) (rejecting an interpretation that "would have [the Court] read an absent word into the statute" because such an interpretation "would result 'not [in] a construction of [the] statute, but, in effect, an enlargement of it by the court'" (second and third alterations in original) (quoting *Iselin v. United States*, 270 U.S. 245, 251 (1926))); *Pub. Citizen*, 533 F.3d at 817 ("Congress knows well how to say that disclosures may be made *only* under specified provisions or circumstances, but it did not do so here." (footnote omitted)). Section 1312(a)'s actual language simply establishes the right of a qualified individual to enroll in any qualified health plan, at any level of coverage.[7] On this reading, giving the phrase "established by the State" its plain meaning creates no difficulty, let alone absurdity. Federal Exchanges might not have qualified individuals, but they would still have customers—namely, individuals who are not "qualified individuals."[8]

---

[7] Under the ACA, qualified health plans may offer four different levels of coverage: bronze, silver, gold, and platinum. The level of coverage reflects the percentage of the insured's medical costs that the plan's benefits are designed to cover. *See* 42 U.S.C. § 18022(d)(1). Lower levels of coverage have higher deductibles and thus higher out-of-pocket costs and, as a general matter, lower premiums. *See id.*; *see also id.* § 18032(a)(2) (providing that qualified employers may "select[] any level of coverage under section 18022(d) . . . to be made available to employees through an Exchange").

[8] The government warns that interpreting section 1312(a) as a non-discrimination provision would allow undocumented aliens to shop on Exchanges. Gov't Br. at 31. But section 1312 specifically

Several other provisions in section 1312 imply that not only "qualified individuals" may participate in an Exchange. Take, for example, the provision concerning incarcerated convicts. Section 1312(f)(1)(B) states that "[a]n individual shall not be treated as a qualified individual if, *at the time of enrollment*, the individual is incarcerated, other than incarceration pending the disposition of charges." 42 U.S.C. § 18032(f)(1)(B) (emphasis added). By implying that an incarcerated convict may enroll in coverage through an Exchange despite not being a "qualified individual," this provision suggests that participation in an Exchange does not depend on "qualified individual" status. That proposition gains further strength from section 1312(d)(3), which states, first, that "[n]othing in this title shall be construed to restrict the choice of a qualified individual to enroll or not to enroll in a qualified health plan or to participate in an Exchange," 42 U.S.C. § 18032(d)(3)(A), and, second, that "[n]othing in this title shall be construed to compel an individual to enroll in a qualified health plan or to participate in an Exchange," *id.* § 18032(d)(3)(B). The second provision, which speaks of "individual[s]" generally, would be wholly unnecessary if only "qualified individuals" were eligible to participate in the Exchanges.[9]

---

addresses that concern, providing that aliens not "lawfully present in the United States . . . may not be covered under a qualified health plan in the individual market that is offered through an Exchange." 42 U.S.C. § 18032(f)(3).

[9] We note that section 1312's heading, "Consumer Choice," and subsection 1312(a)'s heading, "Choice," also suggest that the purpose of section 1312(a) is primarily to protect choice among levels of coverage, not restrict access to Exchanges.

iii

The government also claims that a plain meaning reading of section 36B would have peculiar effects under 42 U.S.C. § 1396a(gg)(1). That provision states that, as a condition of receiving Medicaid funds, a State may not tighten its Medicaid eligibility standards for adults until "the date on which the Secretary determines that an Exchange established by the State under [section 1311] is fully operational." 42 U.S.C. § 1396a(gg)(1). If a federally-established Exchange is not one "established by the State," the government argues, states with federal Exchanges "would *never* be relieved of th[is] . . . requirement," transforming an "interim measure" into a "perpetual obligation." Gov't Br. at 33. But appellants propose a logical explanation for why the ACA might establish this rule: to preserve Medicaid benefits for the impoverished residents of states where, as a result of having federally-established Exchanges, subsidies are unavailable. *Cf. Pub. Citizen*, 533 F.3d at 817 (adopting a reasonable explanation of a provision's purpose despite not being able to "know for certain what purpose Congress had in mind"). In this light, the results produced by giving section 36B its plain meaning seem sensible, not absurd.[10]

---

[10] In a footnote, the government identifies another set of provisions that supposedly embodies the assumption that federal Exchanges are Exchanges "established by the State": 42 U.S.C. § 1397ee(d)(3)(B)-(C). Those provisions instruct states to enroll children in coverage "offered through an Exchange established by the State under section [1311]" in the event of a funding shortfall in a state's Children's Health Insurance Program. *See id.* § 1397ee(d)(3)(B). Although we recognize the oddity of requiring some states and not others to take this step, we do not see how it makes the statute nonsensical or otherwise meets the high threshold

iv

The government urges us, in effect, to strike from section 36B the phrase "established by the State," on the ground that giving force to its plain meaning renders other provisions of the Act absurd. But we find that the government has failed to make the extraordinary showing required for such judicial rewriting of an act of Congress. Nothing about the imperative to read section 36B in harmony with the rest of the ACA requires interpreting "established by the State" to mean anything other than what it plainly says.

C

This conclusion places us at a fork in our precedent. One line of cases instructs us to cease our inquiry and give effect to the statute's unambiguous language. *See Coal. for Responsible Regulation, Inc. v. EPA*, 684 F.3d 102, 137 (D.C. Cir. 2012) (per curiam) (noting, in the *Chevron* context, that "'[w]hen the words of a statute are unambiguous . . . judicial inquiry is complete'" (ellipsis in original) (quoting *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 254 (1992)), *aff'd in relevant part sub nom. Util. Air Regulatory Grp. v. EPA* (*UARG*), 134 S. Ct. 2427, 2448 (2014); *accord Dep't of Housing & Urban Dev. v. Rucker*, 535 U.S. 125, 132-33 (2002); *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438 (1999) ("As in *any* case of statutory construction, our analysis

---

of absurdity. The statute remains workable, and nothing suggests that in states with federal Exchanges, the federal government could not step in and perform the same service for uninsured children. The government's bare citation to the provisions thus hardly demonstrates absurdity.

begins with the language of the statute. And where the statutory language provides a clear answer, it ends there as well." (emphasis added) (internal quotation marks and citation omitted)); *see also Am. Fed'n of Gov't Emps. v. Shinseki*, 709 F.3d 29, 33 (D.C. Cir. 2013). Another tells us to wade into the legislative history in the hope of glimpsing "new light on congressional intent." *Sierra Club v. EPA*, 551 F.3d 1019, 1027 (D.C. Cir. 2008). But, though we recognize that our decision about which path to travel implicates substantial theoretical questions of statutory interpretation, its practical consequences are less momentous here because both paths lead to the same destination. Therefore, assuming *arguendo* that it is proper to consult legislative history when the statutory text is clear, we consider what light the ACA's history offers.

We begin by clarifying the role the ACA's legislative history might play in our analysis. Legislative history is a means to an end, to be consulted for evidence of congressional intent. *See, e.g.*, *Sierra Club*, 551 F.3d at 1027. But legislative history is not the sole, or even the primary, source of such evidence. Rather, "[t]he most reliable guide to congressional intent is the legislation the Congress enacted." *Sierra Club*, 294 F.3d at 161; *see also Cal. Indep. Sys. Operator Corp. v. FERC*, 372 F.3d 395, 400 (D.C. Cir. 2004) ("[W]e assume 'that the legislative purpose is expressed by the ordinary meaning of the words used.'" (quoting *Sec. Indus. Ass'n v. Bd. of Governors of Fed. Reserve Sys.*, 468 U.S. 137, 149 (1984))); *Engine Mfrs. Ass'n*, 88 F.3d at 1088 (noting that the "most traditional tool" for "determin[ing] Congressional intent" is "to read the text"). Where used, legislative history plays a distinctly secondary role. Its purpose is not to confirm already clear text; clear text speaks for itself and requires no "amen" in the historical record. *See, e.g.*, *Harrison v. PPG Indus., Inc.*, 446 U.S. 578, 592 (1980)

("[I]t would be a strange canon of statutory construction that would require Congress to state in committee reports or elsewhere in its deliberations that which is obvious on the face of a statute."). Instead, only when "apparently plain language compels an 'odd result'" might we look to legislative history to ensure that the "'literal application of a statute will [not] produce a result demonstrably at odds with the intentions of its drafters.'" *Engine Mfrs. Ass'n*, 88 F.3d at 1088 (quoting *Public Citizen*, 491 U.S. at 454, and *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242 (1989)). Thus, accepting for the sake of argument the government's contention that the results of appellants' construction of section 36B are odd, our inquiry into the ACA's legislative history is quite narrow. In the face of the statute's plain meaning—a federal Exchange is not an "Exchange established by the State"—we ask only whether the legislative history provides evidence that this literal meaning is "*demonstrably* at odds with the intentions" of the ACA's drafters. Unless evidence in the legislative record establishes that it is, we must hew to the statute's plain meaning, even if it compels an odd result. *See id.* ("[T]here must be evidence that Congress meant something other than what it literally said before a court can depart from plain meaning."); *accord Garcia v. United States*, 469 U.S. 70, 75 (1984) (noting that "only the most extraordinary showing of contrary intentions . . . would justify a limitation on the 'plain meaning' of the statutory language"); *Bldg. & Constr. Trades Dep't, AFL-CIO v. U.S. Dep't of Labor Wage Appeals Bd.*, 932 F.2d 985, 990 (D.C. Cir. 1991).

Here, the scant legislative history sheds little light on the precise question of the availability of subsidies on federal Exchanges. The government points, for example, to a Congressional Budget Office report from November 2009, before the ACA's adoption, that calculated the cost of

subsidies based on the assumption that they would be available in all states. But that assumption is as consistent with an expectation that all states would cooperate (*i.e.*, establish their own Exchanges) as with an understanding that subsidies would be available on federal Exchanges as well. *Cf.* Robert Pear, *U.S. Officials Brace for Huge Task of Operating Health Exchanges*, N.Y. TIMES, at A17 (Aug. 5, 2012) ("When Congress passed legislation to expand coverage two years ago, Mr. Obama and lawmakers assumed that every state would set up its own exchange . . . ."). Equally unilluminating are floor statements by Senate sponsors of the ACA touting the availability and benefits of premium tax credits in general, but not addressing the precise issue of whether they would be available on federal Exchanges.

The government and its amici are thus left to urge the court to infer meaning from silence, arguing that "during the debates over the ACA, no one suggested, let alone explicitly stated, that a State's citizens would lose access to the tax credits if the State failed to establish its own Exchange." Br. of Amici Members of Congress and State Legislatures 8. The historical record, however, belies this claim. The Senate Committee on Health, Education, Labor, and Pensions (HELP) proposed a bill that specifically contemplated penalizing states that refused to participate in establishing "American Health Benefit Gateways," the equivalent of Exchanges, by denying credits to such states' residents for four years. *See* Affordable Health Choices Act, S. 1679, 111th Cong. § 3104(a), (d)(2) (2009). This is not to say that section 36B necessarily incorporated this thinking; we agree that inferences from unenacted legislation are too uncertain to be a helpful guide to the intent behind a specific provision. *See Village of Barrington v. Surface Transp. Bd.*, 636 F.3d 650, 666 (D.C. Cir. 2011). But the HELP Committee's bill certainly demonstrates that members of Congress at least

considered the notion of using subsidies as an incentive to gain states' cooperation.

In any case, even if the historical record were silent, that silence is unhelpful to the government. For the court to depart from the ACA's plain meaning, which favors appellants, "there must be *evidence* that Congress meant something other than what it literally said," from which the court can conclude that applying the statute literally would be "'*demonstrably* at odds with the intentions of [the ACA's] drafters.'" *Engine Mfrs. Ass'n*, 88 F.3d at 1088 (quoting *Ron Pair Enters.*, 489 U.S. at 242) (emphases added). As Chief Justice Marshall wrote, "it is incumbent on those who oppose" a statute's plain meaning "to shew an intent varying from that which the words import." *United States v. Fisher*, 6 U.S. (2 Cranch) 358, 386 (1805). Nothing the government or its amici cite demonstrates what that precise intent was. And "[i]n the absence of such evidence, the court cannot ignore the text by assuming that if the statute seems odd to us, i.e., the statute is not as we would have predicted beforehand that Congress would write it, it could be the product only of oversight, imprecision, or drafting error." *Engine Mfrs. Ass'n*, 88 F.3d at 1088-89; *see also id.* at 1091 ("With such a meager record of what happened in conference, the court is unable to reconstruct the legislative compromises that were made. Even if the final product might strike us as unexpected . . . the court could not make the leap from such an impression to the certainty that such a result was unintentional.").

The government, together with the dissent, also leans heavily on a more abstract form of legislative history— Congress's broad purpose in passing the ACA—urging the court to view section 36B through the lens of the ACA's economic theory and ultimate aims. They emphasize that to achieve the goals of "near universal coverage" and

"lower[ing] health insurance premiums," 42 U.S.C. § 18091(2)(D), (F), the ACA relies on three interrelated policies: insurance market reforms prohibiting insurers from denying coverage or charging higher premiums based on an individual's health status, *see, e.g.*, *id.* § 300gg (community rating requirement); *id.* § 300gg-1 (guaranteed issue requirement); the individual mandate, *see* 26 U.S.C. § 5000A; and subsidies to individuals purchasing insurance in the individual market, *see id.* § 36B. These policies, the government and dissent explain, are like the legs of a three-legged stool; remove any one, and the ACA will collapse. The insurance market reforms are necessary to expand the availability of insurance. The individual mandate is necessary to avoid the adverse selection that would result if people could exploit the insurance market reforms to wait to purchase insurance until they were sick. And subsidies are necessary both to make the mandated insurance affordable and, in so doing, to expand the reach of the individual mandate by reducing the cost of insurance below the threshold—eight percent of household income—at which taxpayers are exempt from the mandate's penalty. *See* 26 U.S.C. § 5000A(e)(1)(A)-(B). Given this structure, the government and dissent argue that it is "inconceivable" to think Congress would have risked the ACA's stability by making subsidies conditional on states establishing Exchanges.[11] Dissenting Op. at 2.

---

[11] Appellants do not challenge the government's account of the economic theory behind the ACA, but they contend that the theory must be understood through the lens of political reality. In their telling, section 36B is the product of legislative compromise to secure the support of Nebraska Senator Ben Nelson, the crucial sixtieth vote needed to avoid a filibuster. Nelson opposed House plans for a national, federally-run exchange, fearing that it would

set the United States down a path to a single-payer system. *See* Carrie Budoff Brown, *Nelson: National Exchange a Dealbreaker*, POLITICO (Jan. 25, 2010), http://www.politico.com/livepulse/0110/ Nelson_National_exchange_a_dealbreaker.html. To gain Nelson's support, proponents of the ACA scrapped the national exchange in favor of establishing exchanges on a state-by-state basis. This change, in turn, required Congress to devise means of inducing states to take on the politically and technologically challenging task of establishing exchanges. Congress's solution, appellants maintain, was a package of "carrots" and "sticks" for states. The carrots included federal grants to states for "activities (including planning activities) related to establishing an [Exchange]." 42 U.S.C. § 18031(a)(3). The sticks included the prohibition against tightening Medicaid eligibility requirements imposed on states that do not create their own Exchanges. *See id.* § 1396a(gg). The most important incentive of all, appellants argue, was the provision at issue here: making premium tax credits available only for individual coverage purchased through state-established Exchanges. According to appellants, the ACA's supporters believed no state would refuse so good an offer—and, appellants add, perhaps no state would have had the IRS not eliminated this incentive by proposing and promulgating the IRS Rule, making subsidies available regardless of which entity established an Exchange, before states had to elect whether to establish Exchanges. *See* Health Insurance Premium Tax Credit, 77 Fed. Reg. 30,377, 30,378 (May 23, 2012); Health Insurance Premium Tax Credit, 76 Fed. Reg. 50,931, 50,934 (Aug. 17, 2011).

Like the government, however, appellants fail to marshal persuasive evidence (apart from the statutory text, that is) in support of their theory. Senator Nelson may have opposed a single, national exchange, but it does not necessarily follow that he opposed making subsidies available on federal fallback Exchanges in uncooperative states. Similarly, the fact that the ACA contained some incentives to states does not necessarily mean that section 36B is one of them. Nor does the fact that Congress has conditioned federal benefits on state cooperation in other contexts shed light on

Yet the supposedly unthinkable scenario the government and dissent describe—one in which insurers in states with federal Exchanges remain subject to the community rating and guaranteed issue requirements but lack a broad base of healthy customers to stabilize prices and avoid adverse selection—is exactly what the ACA enacts in such federal territories as the Northern Mariana Islands, where the Act imposes guaranteed issue and community rating requirements without an individual mandate. *See* 26 U.S.C. § 5000A(f)(4) (exempting residents of such federal territories as Puerto Rico and the Northern Mariana Islands from the individual mandate by providing that they are automatically treated as having "minimum essential coverage"); 42 U.S.C. § 201(f) (providing that the Public Health Service Act, where the guaranteed issue and community rating requirements appear, applies to residents of such territories). This combination, predictably, has thrown individual insurance markets in the territories into turmoil. *See* Sarah Kliff, *Think Your State Has Obamacare Problems? They're Nothing Compared to Guam*, WASH. POST (Dec. 19, 2013), http://www.washingtonpost.com/blogs/wonkblog/wp/2013/12/19/think-your-state-has-obamacare-problems-theyre-nothing-compared-to-guam/. But HHS has nevertheless refused to exempt the territories from the guaranteed issue and

---

the precise question of whether Congress did so in section 36B. Thus, the most that can be said of appellants' theory is that it is plausible. But we need not endorse appellants' historical account to agree with their construction of section 36B. "Where the statutory language is clear and unambiguous, we need neither accept nor reject a particular 'plausible' explanation for why Congress would have written a statute [as it did]." *Barnhart*, 534 U.S. at 460.

community rating requirements, recognizing that, "[h]owever meritorious" the reasons for doing so might be, "HHS is not authorized to choose which provisions of the [ACA] might apply to the territories." Letter from Gary Cohen, Director, Center for Consumer Information and Insurance Oversight, HHS, to Sixto K. Igisomar, Secretary of Commerce, Commonwealth of the Northern Mariana Islands (July 12, 2013), *available at* http://www.doi.gov/oia/igia/upload/12-3-HHS-CMS-CNMI-Letter-igisomar7-12-13.pdf.

Moreover, the territories are not the only instance where the ACA did the unimaginable. A separate title of the ACA, known as the Community Living Assistance Services and Supports (CLASS) Act, *see* ACA, Pub. L. No. 111-148, §§ 8001-8002, 124 Stat. 119, 828-47 (2010), required the Secretary of HHS to establish a long-term care insurance program subject to guaranteed issue and community rating requirements but unaided by an individual mandate or premium subsidies, *see* 124 Stat. at 834. This recipe for adverse selection risk never materialized only because Congress, in response to actuarial analyses predicting that the CLASS Act would be fiscally unsustainable, repealed the provision in 2013.[12] *See* American Taxpayer Relief Act of

---

[12] The dissent attempts to distinguish the market targeted by the CLASS Act from the individual insurance market by pointing out that the CLASS Act contains no individual mandate. In the dissent's view, the omission "of a tool [Congress] knew to be important to preventing adverse selection merely indicates that Congress had a substantially higher tolerance for the risk of adverse selection" in peripheral markets than in the core market. Dissenting Op. at 19. This argument, however, assumes the very conclusion at issue, taking for granted that the mandate in the individual market indeed is as broad as it must be to eliminate all adverse selection risk. But the plain language of section 36B suggests that it is not. If

2012, Pub. L. No. 112-240, § 642, 126 Stat. 2313, 2358 (2013); Sarah Kliff, *The Fiscal Cliff Cuts $1.9 Billion from Obamacare. Here's How*, WASH. POST (Jan. 2, 2013), http://www.washingtonpost.com/blogs/wonkblog/wp/2013/01 /02/the-fiscal-cliff-cuts-1-9-billion-from-obamacare-heres-how/.

The CLASS Act and the provisions applicable to the territories attest that Congress twice did exactly what the government and the dissent insist it never would: introduce significant adverse selection risk to insurance markets. This is not to say that as Congress did in the CLASS Act and territories, so too must it have done in section 36B; perhaps Congress was willing to tolerate risks in those corners of the insurance market that it never would tolerate at its core. But perhaps not. The point is that we don't know, and in asking us to ignore the best evidence of Congress's intent—the text of section 36B—in favor of assumptions about the risks that Congress would or would not tolerate—assumptions

---

section 36B limits the availability of subsidies and thus curtails the reach of the individual mandate, this is evidence that Congress *was* tolerant of adverse selection risk in the core markets, although Congress might not have expected the risk to materialize.

We recognize that, from an economic standpoint, such adverse selection risk bodes ill for individual insurance markets. But it made no more sense economically in the CLASS Act. Congress may simply have miscalculated the consequences of omitting a mandate, as its decision to repeal the CLASS Act suggests. In any event, whether by error or design, the CLASS Act in clear terms created a significant adverse selection risk, which, as Congress and the government recognized, could be undone only by subsequent legislation, not administrative fiat. *Cf. UARG*, 134 S. Ct. at 2445 ("An agency has no power to 'tailor' legislation to bureaucratic policy goals by rewriting unambiguous statutory terms.").

doubtlessly influenced by hindsight—the government and dissent in effect urge us to substitute our judgment for Congress's. We refuse. As the Supreme Court explained just this term, "an agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate." *UARG*, 134 S. Ct. at 2446. And neither may we. "The role of th[e] [c]ourt is to apply the statute as it is written—even if we think some other approach might 'accor[d] with good policy.'" *Burrage v. United States*, 134 S. Ct. 881, 892 (2014) (quoting *Comm'r v. Lundy*, 516 U.S. 235, 252 (1996)) (third alteration in original); *see also Lewis v. City of Chicago*, 560 U.S. 205, 217 (2010) ("[I]t is not our task to assess the consequences of each approach [to interpreting a statute] and adopt the one that produces the least mischief. Our charge is to give effect to the law Congress enacted."); *United States v. Locke*, 471 U.S. 84, 95 (1985) ("[T]he fact that Congress might have acted with greater clarity or foresight does not give courts a carte blanche to redraft statutes in an effort to achieve that which Congress is perceived to have failed to do.").

More generally, the ACA's ultimate aims shed little light on the "precise question at issue," *Chevron*, 467 U.S. at 842— namely, whether subsidies are available on federal Exchanges because such Exchanges are "established by the State." As the Supreme Court has repeatedly warned, "it frustrates rather than effectuates legislative intent simplistically to assume that *whatever* furthers the statute's primary objective must be the law" because "no legislation pursues its purposes at all costs." *Rodriguez v. United States*, 480 U.S. 522, 525-26 (1987) (per curiam); *see also Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 646-47 (1990); *MetroPCS Cal., LLC v. FCC*, 644 F.3d 410, 414 (D.C. Cir. 2011) ("'The Act must do everything necessary to achieve its broad purpose' is the slogan of the enthusiast, not the analytical tool of the arbiter."). Thus, if legislative intent is to be our lodestar, we

cannot assume, as the government does, that section 36B single-mindedly pursues the ACA's lofty goals.

The fact is that the legislative record provides little indication one way or the other of congressional intent, but the statutory text does. Section 36B plainly makes subsidies available only on Exchanges established by states. And in the absence of any contrary indications, that text is conclusive evidence of Congress's intent. *Cf. Ethyl Corp. v. EPA*, 51 F.3d 1053, 1063 (D.C. Cir. 1995) ("At best, the legislative history is cryptic, and this surely is not enough to overcome the plain meaning of the statute."). To hold otherwise would be to say that enacted legislation, on its own, does not command our respect—an utterly untenable proposition. Accordingly, applying the statute's plain meaning, we find that section 36B unambiguously forecloses the interpretation embodied in the IRS Rule and instead limits the availability of premium tax credits to state-established Exchanges.

## IV

We reach this conclusion, frankly, with reluctance. At least until states that wish to can set up Exchanges, our ruling will likely have significant consequences both for the millions of individuals receiving tax credits through federal Exchanges and for health insurance markets more broadly. But, high as those stakes are, the principle of legislative supremacy that guides us is higher still. Within constitutional limits, Congress is supreme in matters of policy, and the consequence of that supremacy is that our duty when interpreting a statute is to ascertain the meaning of the words of the statute duly enacted through the formal legislative process. This limited role serves democratic interests by ensuring that policy is made by elected, politically accountable representatives, not by appointed, life-tenured judges.

Thus, although our decision has major consequences, our role is quite limited: deciding whether the IRS Rule is a permissible reading of the ACA. Having concluded it is not, we reverse the district court and remand with instructions to grant summary judgment to appellants and vacate the IRS Rule.

RANDOLPH, *Senior Circuit Judge*, concurring: A Supreme Court tax decision, and a tax decision of this court, flatly reject the position the government takes in this case.

As Judge Griffith's majority opinion—which I fully join—demonstrates, an Exchange established by the federal government cannot possibly be "an Exchange established by the State." To hold otherwise would be to engage in distortion, not interpretation. Only further legislation could accomplish the expansion the government seeks.

In the meantime, Justice Brandeis' opinion for the Supreme Court in *Iselin v. United States* is controlling: "What the government asks is not a construction of a statute, but, in effect, an enlargement of it by the court, so that what was omitted, presumably by inadvertence, may be included within its scope. To supply omissions transcends the judicial function." 270 U.S. 245, 251 (1926). We held the same in *National Railroad Passenger Corp. v. United States*, 431 F.3d 374, 378 (D.C. Cir. 2005), citing not only *Iselin* but also *Lamie v. United States Trustee*, 540 U.S. 526, 538 (2004), which reaffirmed *Iselin*'s "longstanding" interpretative principle.

EDWARDS, *Senior Circuit Judge*, dissenting: This case is about Appellants' not-so-veiled attempt to gut the Patient Protection and Affordable Care Act ("ACA"). The ACA requires every State to establish a health insurance "Exchange," which "shall be a governmental agency or nonprofit entity that is established by a State." 42 U.S.C. § 18031(b)(1), (d)(1). The Department of Health and Human Services ("HHS") is required to establish "such Exchange" when the State elects not to create one. *Id.* § 18041(c)(1). Taxpayers who purchase insurance from an Exchange and whose income is between 100% and 400% of the poverty line are eligible for premium subsidies. 26 U.S.C. § 36B(a), (c)(1)(A). Appellants challenge regulations issued by the Internal Revenue Service ("IRS") and HHS making these subsidies available in all States, including States in which HHS has established an Exchange on behalf of the State. In support of their challenge, Appellants rely on a specious argument that there is no "Exchange established by the State" in States with HHS-created Exchanges and, therefore, that taxpayers who purchase insurance in these States cannot receive subsidies.

As explained below, there are three critical components to the ACA: nondiscrimination requirements applying to insurers; the "individual mandate" requiring individuals who are not covered by an employer to purchase minimum insurance coverage or to pay a tax penalty; and premium subsidies which ensure that the individual mandate will have a broad enough sweep to attract enough healthy individuals into the individual insurance markets to create stability. These components work *in tandem*. At the time of the ACA's enactment, it was well understood that without the subsidies, the individual mandate was not viable as a mechanism for creating a stable insurance market.

Appellants' proffered construction of the statute would permit States to exempt many people from the individual

mandate and thereby thwart a central element of the ACA. As Appellants' *amici* candidly acknowledge, if subsidies are unavailable to taxpayers in States with HHS-created Exchanges, "the structure of the ACA will crumble." Scott Pruitt, *ObamaCare's Next Legal Challenge*, WALL ST. J., Dec. 1, 2013. It is inconceivable that Congress intended to give States the power to cause the ACA to "crumble."

Appellants contend that the phrase "Exchange established by the State" in § 36B unambiguously bars subsidies to individuals who purchase insurance in States in which HHS created the Exchange on the State's behalf. This argument fails because "the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 666 (2007) (internal quotation marks omitted). When the language of § 36B is viewed in context – *i.e.*, in conjunction with other provisions of the ACA – it is quite clear that the statute does not reveal the plain meaning that Appellants would like to find.

Because IRS and HHS have been delegated authority to jointly administer the ACA, this case is governed by the familiar framework of *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). Under *Chevron*, if "the statute is silent or ambiguous with respect to the specific issue," we defer to the agency's construction of the statute, so long as it is "permissible." *Id.* at 843. The Government's permissible interpretation of the statute easily survives review under *Chevron*. The Act contemplates that an Exchange created by the federal government on a State's behalf will have equivalent legal standing with State-created Exchanges. 42 U.S.C. § 18041. And the ACA would be self-defeating if taxpayers who purchase insurance from an HHS-created Exchange are deemed ineligible to receive subsidies.

Appellants' argument cannot be squared with the clear legislative scheme established by the statute as a whole.

Apparently recognizing the weakness of a claim that rests solely on § 36B, divorced from the rest of the ACA, Appellants attempt to fortify their position with the extraordinary argument that Congress tied the availability of subsidies to the existence of State-established Exchanges to encourage States to establish their own Exchanges. This claim is nonsense, made up out of whole cloth. There is no credible evidence in the record that Congress intended to condition subsidies on whether a State, as opposed to HHS, established the Exchange. Nor is there credible evidence that any State even considered the possibility that its taxpayers would be denied subsidies if the State opted to allow HHS to establish an Exchange on its behalf.

The majority opinion ignores the obvious ambiguity in the statute and claims to rest on plain meaning where there is none to be found. In so doing, the majority misapplies the applicable standard of review, refuses to give deference to the IRS's and HHS's permissible constructions of the ACA, and issues a judgment that portends disastrous consequences. I therefore dissent.

## I. STANDARD OF REVIEW

The first question a reviewing court must ask in a case of this sort is whether the disputed provisions of the statute are clear beyond dispute. "If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect." *Chevron*, 467 U.S. at 843 n.9. In determining whether a statutory provision is ambiguous,

however, a court must evaluate it within the context of the statute as a whole:

> [A] reviewing court should not confine itself to examining a particular statutory provision in isolation. Rather, the meaning – or ambiguity – of certain words or phrases may only become evident when placed in context. . . . It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.

*Nat'l Ass'n of Home Builders*, 551 U.S. at 666 (citations, alteration, and internal quotation marks omitted); *see also FDA v. Brown & Williamson Tobacco Corp*., 529 U.S. 120, 132-33 (2000); *Davis v. Mich. Dep't of Treasury,* 489 U.S. 803, 809 (1989).

In other words, "[t]he plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997). The Supreme Court just recently reiterated this principle, making it clear that even when a statute is not "a *chef d'oeuvre* of legislative draftsmanship" – as the ACA is not – courts must bear "in mind the fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Util. Air Regulatory Grp. v. EPA*, No. 12-1146, 2014 WL 2807314, at *9 (June 23, 2014) (internal quotation marks omitted).

When a "court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute." *Chevron*,

467 U.S. at 843. Rather, "the question for the court is whether the agency's answer is based on a permissible construction of the statute," *id.,* that is, whether the agency's interpretation is "manifestly contrary to the statute," *id.* at 844. *See, e.g.*, *Mayo Found. for Med. Educ. & Research v. United States*, 131 S. Ct. 704, 711 (2011) (deferring to the agency's interpretation because the statute did not speak with "the precision necessary" to definitively answer the question, and the agency's interpretation was not "manifestly contrary to the statute").

Appellants argue that *Chevron* deference is unwarranted because some of the provisions at issue "are codified in a chapter of Title 42 . . . the domain of *HHS*, not the IRS," and the "IRS has no power to enforce or administer those provisions." Br. for Appellants at 46. Appellants' position is mistaken. *Chevron* applies because IRS and HHS are tasked with administering the provisions of the ACA in coordination. *See* 42 U.S.C. § 18082(a); *Nat'l Ass'n of Home Builders*, 551 U.S. at 665 (applying *Chevron* deference to a regulation promulgated by the National Marine Fisheries Service and the Fish and Wildlife Service "acting jointly"). Here, there is no issue of one agency interpreting the statute in a way that conflicts with the other agency's interpretation. The IRS's rule defines "Exchange" by reference to the HHS's definition, which provides that subsidies are available to low-income taxpayers purchasing insurance on an Exchange "regardless of whether the Exchange is established and operated by a State . . . or by HHS." 45 C.F.R. § 155.20; 26 C.F.R. § 1.36B-1(k).

Appellants also argue that *Chevron* deference is precluded by the canon that "tax credits 'must be expressed in clear and unambiguous terms.'" Br. for Appellants at 51 (quoting *Yazoo & Miss. Valley R.R. Co. v. Thomas*, 132 U.S. 174, 183 (1889)). Again, Appellants' position is mistaken. The Supreme Court

has made clear that "[t]he principles underlying [the] decision in *Chevron* apply with full force in the tax context." *Mayo Found.*, 131 S. Ct. at 713.

*Chevron* plainly applies to this case. And this court is obliged to defer to the IRS's and HHS's "permissible" interpretations of the ACA. *Chevron*, 467 U.S. at 843.

## II. ANALYSIS

Appellants' argument focuses almost entirely on 26 U.S.C. § 36B, considered in isolation from the other provisions of the ACA. Repeating the phrase "Exchange established by the State" as a mantra throughout their brief, Appellants contend that this language unambiguously indicates that § 36B(b) conditions refundable tax credits on a *State* – and not *HHS* – establishing an Exchange.

Appellants' argument unravels, however, when the phrase "established by the State" is subject to close scrutiny in view of the surrounding provisions in the ACA. *See Brown & Williamson*, 529 U.S. at 132 ("The . . . ambiguity . . . of certain . . . phrases may only become evident when placed in context."). In particular, § 36B has no plain meaning when read in conjunction with § 18031(d)(1) and § 18041(c). And, more fundamentally, the purported plain meaning of § 36B(b) would subvert the careful policy scheme crafted by Congress, which understood when it enacted the ACA that subsidies were critically necessary to ensure that the goals of the ACA could be achieved. Simply put, § 36B(b) interpreted as Appellants urge would function as a poison pill to the insurance markets in the States that did not elect to create their own Exchanges. This surely is not what Congress intended.

Perhaps because they appreciate that no legitimate method of statutory interpretation ascribes to Congress the aim of tearing down the very thing it attempted to construct, Appellants in this litigation have invented a narrative to explain why Congress would want health insurance markets to fail in States that did not elect to create their own Exchanges. Congress, they assert, made the subsidies conditional in order to *incentivize* the States to create their own exchanges. This argument is disingenuous, and it is wrong. Not only is there no evidence that anyone in *Congress* thought § 36B operated as a condition, there is also no evidence that *any State* thought of it as such. And no wonder: The statutory provision presumes the existence of subsidies and was drafted to establish a formula for the payment of tax credits, not to impose a significant and substantial condition on the States.

It makes little sense to think that Congress would have imposed so substantial a condition in such an oblique and circuitous manner. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) ("Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms . . . ."). The simple truth is that Appellants' incentive story is a fiction, a *post hoc* narrative concocted to provide a colorable explanation for the otherwise risible notion that Congress would have wanted insurance markets to collapse in States that elected not to create their own Exchanges.

In the end, the question for this court is whether § 36B *unambiguously* operates as a condition limiting the tax subsidies that Congress understood were a necessary part of a functioning insurance market to *only* those States that created their own exchange. The phrase "Exchange established by the State," standing alone, suggests the affirmative. But there is powerful evidence to the contrary – both in § 36B and the

provisions it references, and in the Act as a whole – that shows Appellants' argument to be fatally flawed.

It is not the prerogative of this court to interpret the ambiguities uncovered in the ACA. Congress has delegated this authority to the IRS and HHS. And the interpretation given by these agencies is not only *permissible* but also the *better* construction of the statute because § 36B is not clearly drafted as a condition, because the Act empowers HHS to establish exchanges *on behalf of* the States, because parallel provisions indicate that Congress thought that federal subsidies would be provided on HHS-created exchanges, and, most importantly, because Congress established a careful legislative scheme by which individual subsidies were *essential* to the basic viability of individual insurance markets.

### A. *Appellants' "Plain Meaning" Argument Viewed in Context*

In arguing that the ACA clearly and unambiguously bars subsidies to individuals who purchase insurance in States in which HHS created the Exchange on the State's behalf, Appellants rest on a narrow, out-of-context interpretation of § 36B(b) and § 36B(c)(2)(A)(i). Br. for Appellants at 16. Appellants argue that because there is no "Exchange established by the State" in States with HHS-created Exchanges, taxpayers who purchase insurance in these States cannot receive subsidies. This plain meaning argument, which views § 36B in isolation, is simplistic and wrong.

We cannot read § 36B in isolation; we must also consider the specific context of the provision and the "broader context of the statute as a whole." *Robinson*, 519 U.S. at 341. And viewing the matter through this wider lens, as we must, the provision which initially might appear plain is far from

unambiguous. To begin with, as the Government points out, § 36B refers to premiums for health plans enrolled in through "an Exchange established by the State *under 1331* [*i.e.*, 42 U.S.C. § 18031]." 26 U.S.C. § 36B(b) (emphasis added). The cross-referenced provision – 42 U.S.C. § 18031 – contains language indicating that *all* States are required to establish an exchange under the section. *See* 42 U.S.C. § 18031(b)(1) ("Each State *shall* . . . establish an American Health Benefit Exchange . . . ."); *see also id.* § 18031(d)(1) ("An Exchange *shall be* a governmental agency or nonprofit entity *that is established by a State*." (emphasis added)). In other words, if our statutory universe consisted only of these two provisions, it would be clear that § 36B intended that residents in *all* States would receive subsidies because *all* States were required to create such exchanges by the section of the Act referenced in § 36B.

Of course, the ACA is broader than just § 36B and § 18031, and in 42 U.S.C. § 18041 it permits a State to elect to allow HHS to establish the Exchange on behalf of the State. In such circumstances, however, the Act *requires* HHS to establish and operate "*such* Exchange." *Id.* § 18041(c) (emphasis added). The use of "such" can reasonably be interpreted to deem the HHS-created Exchange to be the equivalent of an Exchange created in the first instance by the State. That is, when HHS creates an exchange under § 18041(c), it does so *on behalf of* the State, essentially standing in its stead. Put differently, under the ACA, an Exchange within a State is a given. The only question is whether the State opts to create the Exchange on its own or have HHS do it on its behalf. On this view, "established by the State" is term of art that includes any Exchange within a State.

Indeed, the Act says as much when it defines the term "Exchange" as "a governmental agency or nonprofit entity

that is established by a State." 42 U.S.C. § 18031(d)(1). It is clear that § 18031 is the source of the definition of the term "Exchange" under the Act. *See* 42 U.S.C. § 300gg-91(d)(21) (defining "Exchange" for purpose of Public Health Service Act to mean what it does in § 18031); *id.* § 18111 (incorporating the definitions in § 300gg-91 for purpose of Title I of the ACA). It is also clear that § 18031 defines *every* "Exchange" under the Act as "a governmental agency or nonprofit entity that is *established by a State*." *Id.* § 18031(d)(1) (emphasis added). Because § 18041(c) authorizes the federal government to establish "Exchanges," the phrase "established by the State" in § 18031 must be broad enough to accommodate Exchanges created by the HHS on a State's behalf. Section 36B expressly incorporates this broad definition of "Exchange" when it uses the phrase an "Exchange established by the State *under [§ 18031]*." 26 U.S.C. § 36B(b) (emphasis added). Therefore, the phrase "established by the State" in § 36B is reasonably understood to take its meaning from the cognate language in the incorporated definition in § 18031, which embraces Exchanges created by HHS on the State's behalf. *See, e.g.*, *Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 570 (1995) (noting "the normal rule of statutory construction that identical words used in different parts of the same act are intended to have the same meaning" (internal quotation marks omitted)). These provisions belie the "plain meaning" that Appellants attempt to attribute to § 36B.

What is more, Appellants' interpretation of the operative language in § 36B sits awkwardly with the section's structure. Subsection (a) provides tax credits to any "applicable taxpayer," defined in reference to the poverty line and without regard to what the taxpayer's State has or has not done. 26 U.S.C. § 36B(a), (c)(1)(A). Subsection (b) then establishes a numerical formula for calculating the amount of the subsidy. *Id.* § 36B(b). It is only in the context of this numerical formula

and its definition of "coverage month" that the purported condition is found. *Id.* § 36B(b)(1), (c)(2)(A)(i). If Congress intended to create a significant condition on taxpayer eligibility for subsidies of the sort advocated by Appellants, one would expect that it would say so plainly and clearly. *See Am. Trucking Ass'ns*, 531 U.S. at 468. There is no "if/then" or other such conditional language in § 36B. Instead, if Appellants are to be believed, Congress thought it appropriate to incentivize significant State action (creating Exchanges) through an oblique and indirect condition. This is an implausible reading of the statute.

The simple truth is that the phrase "established by the State" in § 36B does not have the plain meaning that Appellants would like. The inquiry does not end with a narrow look at § 36B. That provision must be read in conjunction with § 18031(d)(1) and § 18041(c); and these provisions, read together, defy any claim of plain meaning.

Furthermore, in order to address the question before us, this court is obliged to consider § 36B in "the broader context of the statute as a whole." *Robinson*, 519 U.S. at 341; *see also Zuni Pub. Sch. Dist. No. 89 v. Dep't of Educ.*, 550 U.S. 81, 98 (2007) (looking to "basic purpose and history" of statute). The Supreme Court's recent decision in *Michigan v. Bay Mills Indian Community*, 134 S. Ct. 2024 (2014), which Appellants cite, is not to the contrary. *See also Util. Air Regulatory Grp.,* 2014 WL 2807314, at *9 (reaffirming that courts must bear "in mind the fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme" (internal quotation marks omitted)). Nothing in *Bay Mills* or *Utility Air Regulatory Group* purport to undermine the commonsense principle – repeatedly endorsed by the Court – that the operative text must be understood in its statutory context, nor

the subsidiary principle, which follows from the first, that evidence of meaning drawn from the broader statutory context can render the operative text ambiguous on a particular question of law. Appellants' argument in this case is illogical when cast in the context of the statute as a whole.

## B. *The Statute Read as a Whole*

### 1. The "Three-Legged Stool" and the Indispensable Role of the Tax Subsidies

Appellants' interpretation is implausible because it would destroy the fundamental policy structure and goals of the ACA that are apparent when the statute is read as a whole. A key component to achieving the Act's goal of "near-universal coverage" for all Americans is a series of measures to reform the individual insurance market. 42 U.S.C. § 18091(2)(D). These measures – nondiscrimination requirements applying to insurers, the individual mandate, and premium subsidies – work *in tandem*, each one a necessary component to ensure the basic viability of each State's insurance market. Because premium subsidies are so critical to an insurance market's sustainability, Appellants' interpretation of § 36B would, in the words of Appellants' *amici*, cause "the structure of the ACA [to] crumble." Scott Pruitt, *ObamaCare's Next Legal Challenge*, WALL ST. J., Dec. 1, 2013.

This point is essential and worth explaining in detail. The ACA has been described as a "three-legged stool" in view of its three interrelated and interdependent reforms. Br. for Economic Scholars at 7. The first "leg" of the ACA is the "guaranteed issue" and "community rating" provisions, which prohibit insurers from denying coverage based on health status or history, 42 U.S.C. § 300gg-1, and require insurers to offer coverage to all individuals at community-wide rates, *id*.

§ 300gg(a). But such nondiscrimination provisions cannot function alone because of the problem of "adverse selection." When insurers cannot deny coverage or charge sick or high-risk individuals higher premiums, healthy people delay purchasing insurance (knowing they will not be denied coverage if and when they become sick), and insurers' risk pools thus become skewed toward high-risk individuals (as they are the only ones willing to pay the premiums). The result is that insurers wind up paying more per average on each policy, which leads them to increase the community-wide rate, which, in turn, serves only to exacerbate the "adverse selection" process (as now only those who are *really* sick will find insurance worthwhile). This is the so-called "death-spiral," which Congress understood would doom each State's individual insurance market in the absence of a multifaceted reform program. *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2626 (2012) (Ginsburg, J., concurring in part and dissenting in part).

This is where the individual mandate, the second "leg" of the ACA, comes in. Congress recognized:

> [I]f there were no requirement, many individuals would wait to purchase health insurance until they needed care. By significantly increasing health insurance coverage, the [individual coverage] requirement, together with the other provisions of this Act, will minimize this adverse selection and broaden the health insurance risk pool to include healthy individuals, which will lower health insurance premiums. The requirement is essential to creating effective health insurance markets in which improved health insurance products that are guaranteed issue and do not exclude coverage of pre-existing conditions can be sold.

42 U.S.C. § 18091(2)(I). Accordingly, the Act requires each individual who is not covered by an employer to purchase minimum coverage or to pay a tax penalty. 26 U.S.C. § 5000A(a)-(b). But recognizing that individuals cannot be made to purchase what they cannot afford, Congress provided that the mandate would not apply if the cost of insurance exceeds eight percent of the taxpayer's income after subsidies. *Id.* § 5000A(e)(1).

The third "leg" of the ACA is the subsidies. The subsidies ensure that the individual mandate will have a broad enough sweep to attract enough healthy individuals into the individual insurance markets to create stability, *i.e.*, to prevent an adverse-selection death spiral. Without the subsidies, the individual mandate is simply not viable as a mechanism for creating a stable insurance market: the lowest level of coverage for typical subsidy-eligible participants will cost 23% of income, meaning that these individuals will be exempt from the mandate. *Id.*; Br. for Economic Scholars at 17-18. Congress was informed of the importance of the subsidies to the overall legislative scheme. *See Roundtable Discussion on Expanding Health Care Coverage: Hearing Before the Senate Comm. On Finance*, 111th Cong. 504 (2009) (statement of Sandy Praeger, Comm'r of Insurance for the State of Kansas) ("State regulators can support these reforms to the extent they are coupled with an effective and enforceable individual purchase mandate *and appropriate income-sensitive subsidies to make coverage affordable.*" (emphasis added)); *see also* CONGRESSIONAL BUDGET OFFICE, AN ANALYSIS OF HEALTH INSURANCE PREMIUMS UNDER THE PATIENT PROTECTION AND AFFORDABLE CARE ACT 24 (Nov. 30, 2009), (estimating that approximately 78% of people purchasing their own coverage would receive subsidies). It is thus no surprise that Congress provided generous subsidies in the ACA and, importantly, expressly linked the operation of the individual mandate to the

cost of insurance *after* taking account of the subsidies. 26 U.S.C. § 5000A(e)(1)(B)(ii).

If nothing else, it is clear that premium subsidies are an essential component of the regulatory framework established by the ACA. If, as Appellants contend, a State could block subsidies by electing not to establish an Exchange, this would exempt a large number of taxpayers from the individual mandate, cause the risk pool to skew toward higher risk people, and effectively cut the heart out of the ACA. This is one of the points that was made in the joint opinion by Justice Scalia, Justice Kennedy, Justice Thomas, and Justice Alito in *National Federation of Independent Business v. Sebelius*:

> Without the federal subsidies, individuals would lose the main incentive to purchase insurance inside the exchanges, and some insurers may be unwilling to offer insurance inside of exchanges. With fewer buyers and even fewer sellers, the exchanges would not operate *as Congress intended* and may not operate at all.

132 S. Ct. at 2674 (Scalia, Kennedy, Thomas, and Alito, JJ., dissenting) (emphasis added); *see also* Br. for the Appellees at 38 ("Insurers in States with federally-run Exchanges would still be required to comply with guaranteed-issue and community rating rules, but, without premium tax subsidies to encourage broad participation, insurers would be deprived of the broad policy-holder base required to make those reforms viable."). This "adverse selection" is precisely what Congress sought to avoid when it enacted the individual mandate. 42 U.S.C. § 18091(2)(I). It is unfathomable that Congress intended to allow States to effectively nullify the individual mandate, which it recognized was necessary to the viability of an individual insurance market subject to the "guaranteed issue" and "community rating" requirements.

Section 36B cannot be interpreted divorced from the ACA's unmistakable regulatory scheme in which premium subsidies are an indispensable component of creating viable and stable individual insurance markets. Due regard for the carefully crafted legislative scheme casts § 36B in a clearer light. "Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *Am. Trucking Ass'ns*, 531 U.S. at 468. If Congress meant to deny subsidies to taxpayers in States with HHS-created Exchanges – thereby initiating an adverse-selection death-spiral that would effectively gut the statute in those States – one would expect to find this limit set forth in terms as clear as day. But the subsection defining which taxpayers are eligible for subsidies make no mention of State-established Exchanges. Subsidies are available to an "applicable taxpayer," 26 U.S.C. § 36B(a), and "applicable taxpayer" is defined as any individual whose household income for the taxable year is between 100% and 400% of the poverty line, *id*. § 36B(c)(1)(A).

A comparison with the ACA's Medicaid expansion condition offers a striking case in point. This condition demonstrates that Congress knew how to speak clearly and provide notice to States when it intended to condition funding on State behavior. The Medicaid provision lays out an express conditional statement in the form of "*if, then*": "*If* the Secretary, after reasonable notice and opportunity for hearing," determines that the State is not in compliance with the Medicaid-expansion requirements, the Secretary "shall notify such State agency that further payments will not be made to the State." 42 U.S.C. § 1396c (emphasis added). This provision stands in stark contrast to § 36B. The formula for calculating subsidies does not say, for example, "*If* a State

does not create an Exchange, its taxpayers shall be ineligible for premium credit subsidies," or "*If* coverage is purchased on an Exchange established by HHS, premium credit subsidies will not be available." Furthermore, § 1396c ensures that States receive *notice* before Medicaid funding is withheld. In contrast, there is no similar notice to States that their taxpayers will be denied subsidies if the State elects to have HHS create an Exchange on its behalf.

The majority thinks it unremarkable that Congress would condemn insurance markets in States with federally-created Exchanges to an adverse-selection death spiral. It reaches this conclusion by observing that, in peripheral statutory provisions, Congress has twice created insurance markets that suffered from the defect of having guaranteed issue requirements without the other measures (such as a mandate or subsidies) necessary to ensure the soundness of the market. Congress did this, the majority notes, in the provisions covering the Northern Mariana Islands and other federal territories, *see* 26 U.S.C. § 5000A(f)(4); 42 U.S.C. § 201(f), and in the Community Living Assistance Services and Supports (CLASS) Act, Pub. L. No. 111-148, §§ 8001-8002, 124 Stat. 119, 828-47 (2010).

This argument entirely misses the point. These peripheral statutory provisions say nothing about the core provisions of the ACA at issue here, as both the majority and the Appellants recognize. In both provisions, Congress purposely decided not to impose an individual mandate. That is a crucial difference. The Government and supporting *amici*'s position in this case relies on Congress' express recognition that the individual mandate, "*together with the other provisions* of this Act, will minimize . . . adverse selection," and that, as such, the mandate "is essential to creating effective health insurance markets" with guaranteed-issue requirements. 42 U.S.C.

§ 18091(2)(I) (emphasis added). This recognition, together with Congress' linking the mandate to the subsidies available to taxpayers, 26 U.S.C. § 5000A(e)(1)(B)(ii), demonstrates that Congress appreciated that subsidies would be an integral part of ensuring that the individual mandate reached broadly enough to secure the viability of the insurance market. By not imposing individual mandates in the peripheral markets identified by the majority (*i.e.*, in the territories and the CLASS Act), Congress displayed a willingness to tolerate the risk that these markets would succumb to adverse selection. Congress displayed no such willingness here; in the markets covered by the core provisions of the ACA, Congress imposed an individual mandate linked to subsidies as an "essential" tool to ensure market viability. 42 U.S.C. § 18091(2)(I).

Appellants suggest that because Congress enacted peripheral statutory provisions covering territories and in the CLASS Act without including measures to ensure a broad base of healthy customers to stabilize prices and avoid adverse selection, it is reasonable to assume that Congress did the same thing with respect to the core provisions of the ACA. But this argument gets it backwards. The CLASS Act and the provisions covering the federal territories importantly demonstrate that when Congress determined to expose an insurance market to significant adverse selection risk, it specifically declined to enact an individual mandate. In other words, Congress acted intentionally when it passed the CLASS Act and the provisions covering the federal territories *without an individual mandate*. The core provisions of the ACA *include an individual mandate*, which of course indicates that Congress meant to treat the core provisions of the ACA differently.

Appellants' arguments to the contrary are perplexing, to say the least. Congress' omissions of an individual mandate –

which it recognized as an "essential" tool to prevent adverse selection, 42 U.S.C. § 18091(2)(I) – from the peripheral statutory provisions cited by the majority are not evidence that Congress had some monolithic statute-wide tolerance of the risk that insurance markets might succumb to adverse selection. To the contrary, Congress' intentional omissions in these peripheral insurance markets of a tool it knew to be important to preventing adverse selection merely indicates that Congress had a substantially higher tolerance for the risk of adverse selection in such markets vis-à-vis the core markets where it did impose the individual mandate. The CLASS Act and the provisions covering the territories thus do not rebut the Government's structural argument. Indeed, if anything, the subsequent history concerning the territories and the CLASS Act serve only to highlight that Congress was correct in its judgment that an individual mandate – accompanied by subsidies to ensure its scope was sufficiently large – was necessary to stave off adverse selection in insurance markets. As Appellants note, without an individual mandate, the CLASS Act was "unworkable," which led Congress to repeal it. Reply Br. for Appellants at 15.

The Government and supporting *amici*'s structural argument in this case cannot be dismissed as idle meanderings into legislative history. It is apparent from the statutory text of the ACA that Congress understood (1) the importance of a broadly applicable individual mandate that works "together with the other provisions" to ensure the viability of an insurance market against the threat of adverse selection, 42 U.S.C. § 18091(2)(I), and (2) the necessity of taxpayer subsidies to broaden the scope of the individual mandate, *see* 26 U.S.C. § 5000A(e)(1)(B)(ii). In giving short shrift to the clear statutory scheme adopted by Congress when it enacted the core provisions of the ACA, the majority has ignored congressional intent and improperly rejected the reasonable

interpretations of HHS and IRS. In sum, the majority has drawn the wrong lesson from the CLASS Act and the provisions covering federal territories, which demonstrate just the opposite of the conclusion reached by the majority.

### 2. The Advance Payment Reporting Requirements of § 36B(f)(3)

One of the subsections in § 36B – which is the section upon which Appellants stake their case – makes it clear that Congress intended that taxpayers on HHS-created Exchanges would be eligible for subsidies. Subsection (f), entitled "Reconciliation of credit and advance credit," tasks the IRS with reducing the amount of a taxpayer's end-of-year premium tax credit under § 36B by the sum of any advance payments of the credit. 26 U.S.C. § 36B(f). Crucially, subsection (f) establishes reporting requirements that *expressly apply to HHS-created Exchanges*. *Id.* § 36B(f)(3) (citing 42 U.S.C. § 18041(c)). These reporting requirements mandate that Exchanges provide certain information to the IRS, including the "aggregate amount of any advance payment of such credit"; information needed to determine the taxpayer's "eligibility for, and the amount of, such credit"; and "[i]nformation necessary to determine whether a taxpayer has received excess advance payments." *Id.* § 36B(f)(3)(C), (E), (F). The self-evident primary purpose of these requirements – reconciling end-of-year premium tax credits with advance payments of such credits – could not be met with respect to Exchanges created by HHS on behalf of a State if these Exchanges were not authorized to deliver tax credits. Indeed, HHS-created Exchanges would have nothing to report regarding subsidies were they barred from giving any. It is thus plain from subsection (f) that Congress intended credits under § 36B to be available to taxpayers in States with HHS-created Exchanges.

Appellants' attempts to minimize the importance of the reporting requirements are specious. They first argue that, even if credits are unavailable on federally-created Exchanges, the reporting provision would nevertheless serve a purpose: to enforce the individual mandate to buy insurance. This amounts to a sleight of hand. The argument ignores the clear purpose – apparent from the statutory text – of subsection (f) and its reporting requirements. The purpose is front and center in the subsection's title – "Reconciliation of credit and advance credit," *id.* § 36B(f) – and is reinforced by the wording and structure of the provision. Consistent with its title, subsection (f) charges the IRS with reconciling the ultimate tax credit to be paid with any advanced payments of the credit, *id.* § 36B(f)(1), including advance payments that "exceed the credit allowed" for the tax year, *id.* § 36B(f)(2). The IRS, of course, can accomplish these tasks only if it has adequate information, and the next paragraph, § 36B(f)(3), establishes the reporting requirements that ensure that the IRS has the information it needs to satisfy the terms of the statute. *See id.* § 36B(f)(3)(C), (E), (F) (requiring disclosure of information concerning advanced payments of tax credits). Obviously, *some* of the information covered by subsection (f)(3) will also assist in enforcing the individual mandate. But much of the information required to be disclosed by subsection (f)(3) is irrelevant to the purpose hypothesized by Appellants (*i.e.*, to enforcing the mandate). *See id.* § 36B(f)(3)(F) (mandating the reporting of "[i]nformation necessary to determine whether a taxpayer has received excess advance payments"); *id.* § 5000A(e)(1)(A)-(B) (in determining whether an individual is exempted from the mandate, the statute takes account of the "amount of the credit allowable," but not the amount of excess advance payments).

In a letter submitted to the court before oral argument, Appellants cited an IRS regulation, 26 C.F.R. § 1.6055-1(d)(1), that addresses information reporting requirements. "In order to reduce the compliance burden on" insurers, the IRS decided not to require insurers "to report under section 6055 for coverage under individual market qualified health plans purchased through an Exchange because Exchanges must report on this coverage under section 36B(f)(3)." Information Reporting of Minimum Essential Coverage, 79 Fed. Reg. 13,220, 13,221 (Mar. 10, 2014). Appellants seem to think that this regulation somehow vindicates their view of § 36B(f)(3), but their argument makes no sense. That the IRS determined that additional reporting by insurers in specified circumstances was unnecessary does not imply that Congress drafted § 36B(f)(3) solely to enforce the individual mandate, as Appellants would have it. What is clear here is that § 36B(f)(3) establishes reporting requirements for the *principal* purpose of requiring disclosure of information concerning advanced payments of tax credits, a purpose which cannot be squared with Appellants' interpretation under which no credits are available on federally-created Exchanges.

Appellants also argue that the reporting provisions in subsection § 36B(f) are already over-inclusive because they apply to plans serving taxpayers who, by reason of their income, are ineligible for subsidies. The implication suggested by Appellants – and accepted too easily by the majority – is that the reporting requirements in § 36B(f)(3) already suffer from over-inclusiveness (since such taxpayers will have neither credits nor advance payments) and that there is thus little reason to be concerned about the additional over-inclusiveness generated by Appellants' interpretation of § 36B. Framing the issue in this manner obscures a fundamental difference. Interpreting § 36B to foreclose credits on federally-created Exchanges would not merely increase the

"over-inclusiveness" of § 36B(f)(3)'s reporting requirements; it would render certain of the reporting requirements pointless as to *every single taxpayer* on an HHS-created Exchange. This is a nonsensical interpretation because Congress enacted the § 36B(f)(3) reporting requirements to apply to HHS-created Exchanges. *Id.* § 36B(f)(3) (citing 42 U.S.C. § 18041(c)). The provision is powerful evidence that Congress intended that tax credits be available on federally-created Exchanges.

## 3. Other Provisions

There are two other provisions of the ACA that strongly support the Government's claim that the statute, read as a whole, permits taxpayers who purchase insurance in non-electing States to receive subsidies. First, the statute defines a "qualified individual" as a person who "resides in the State that established the Exchange." 42 U.S.C. § 18032(f)(1)(A)(ii). There is no separate definition of "qualified individual" for States with HHS-created Exchanges. If an HHS-created Exchange does not count as established by the State it is in, there would be no individuals "qualified" to purchase coverage in the 34 States with HHS-created Exchanges. This would make little sense.

Second, in a subparagraph entitled "Assurance of exchange coverage for targeted low-income children unable to be provided child health assistance as a result of funding shortfalls," the ACA requires States to "ensure" that low-income children who are not covered under the State's child health plan are enrolled in a health plan that is offered through "an Exchange established by the State under [§ 18031]." 42 U.S.C. § 1397ee(d)(3)(B). Here again, the statute simply presumes that the existence of such State-established exchanges. The statute's objective of "*assur[ing] exchange coverage for targeted low-income children*" would be largely

lost if States with HHS-created Exchanges are excluded. There is nothing in the statute to indicate that Congress meant to exclude benefits for low-income children in the 34 States in which HHS has established an Exchange on behalf of the State.

\*     \*     \*

In view of the foregoing, Appellants' reliance on *Bay Mills* is entirely misplaced. In citing that case, Appellants simply cherry pick language which appears favorable to their side but which does not reflect the Court's reasoning. It is true, of course, that courts have no "roving license" to disregard a statute's unambiguous meaning. 134 S. Ct. at 2034. This was an important point in *Bay Mills* because it was undisputed in that case that the plaintiff's position could not be squared with the plain meaning of the statute. And the plaintiff in *Bay Mills* failed "to identify *any* specific textual or structural features of the statute to support its proposed result." *Id.* at 2033 (emphasis added). *Bay Mills* is plainly inapposite. Here, by contrast, there is considerable evidence – textual and structural – to render the ACA ambiguous on the question whether § 36B operates to bar tax subsidies in States in which HHS has established an Exchange on behalf of the State. And, as shown above, when the ACA is read as a whole – including its "textual [and] structural features," "purpose," "history and design," *id*. at 2033-34 – it is clear that the Government's interpretation of the ACA is permissible and reasonable, and, therefore, entitled to deference under *Chevron*.

**C.** ***Appellants' Extraordinary Subsidies-As-Incentive Argument***

The foregoing examination of the statute shows that when the terms of § 36B are read "with a view to their place in the overall statutory scheme," *Nat'l Ass'n of Home Builders*, 551 U.S. at 666, Appellants' plain meaning argument fails. Appellants obviously recognize that their argument resting on § 36B in isolation, apart from the rest of the ACA, is ridiculous. This is clear because, in an effort to bolster their claim, Appellants proffer the extraordinary argument that Congress limited subsidies to State-run Exchanges as an incentive to encourage States to set up their own Exchanges. Br. for Appellants at 28. As noted above, this argument is nonsense. Appellants have no credible evidence whatsoever to support their subsidies-as-incentive theory.

The record indicates that, when the ACA was enacted, no State even considered the possibility that its taxpayers would be denied subsidies if the State opted to allow HHS to establish an Exchange on its behalf. Not one. Indeed no State even suggested that a lack of subsidies factored into its decision whether to create its own Exchange. Br. of Members of Congress and State Legislatures at 24-25 & n.30 (citing authorities). "States were motivated by a mix of policy considerations, such as flexibility and control, and 'strategic' calculations by ACA opponents, not the availability of tax credits." *Id.* at 24-25 n.30 (citing authorities). The fact that all States recognized and protested the Medicaid expansion condition, while no State raised any concern over the purported subsidy-condition shows that Appellants' argument is at best fanciful. *See* Br. for the Appellees at 42 ("[T]he twenty-six plaintiff states in [*Nat'l Fed'n of Indep. Bus.*, 132 S. Ct. 2566,] repeatedly contrasted the Medicaid eligibility expansion with the 'real choice that the ACA offers States to

create exchanges or have the federal government do so.'" (quoting Br. for State Pet'rs on Medicaid, *Florida v. HHS*, No. 11-400, 2012 WL 105551, at *51 (2012))).

The legislative history also indicates that Congress assumed subsidies would be available on HHS-created Exchanges. First, earlier proposals for the legislation and an earlier version of the House Bill provided that the federal government would establish and operate Exchanges. *Halbig v. Sebelius*, 2014 WL 129023, at *17 (D.D.C. Jan. 15, 2014) (citing Reconciliation Act of 2010, H.R. 4872 §§ 141(a), 201(a) (2010) (version reported in the House on March 17, 2010); H. REP. NO. 111–443, at 18, 26 (2013)). When the legislation was modified so that States could operate their own Exchanges, the Senate Finance Committee expressly acknowledged that the federal government could "establish state exchanges." *Id.* (citing S. REP. NO. 111–89, at 19 (2009) ("If these [state] interim exchanges are not operational within a reasonable period after enactment, the Secretary [of HHS] would be required to contract with a nongovernmental entity to *establish state exchanges* during this interim period.") (emphasis added)).

In addition, the three House Committees with jurisdiction over the ACA legislation issued a fact sheet explaining that States would have a choice whether to create their own Exchanges or have one run by the federal government, and "the Exchanges" would make health insurance more affordable. The fact sheet recognized income level as the *only* criteria for subsidy-eligibility. Br. for Members of Congress and State Legislatures at 11-12. The Joint Committee on Taxation also reported that the subsidies would be available to those who purchase insurance through "an exchange." *Id.* at 12. And Congressional Budget Office estimates assumed that subsidies would be available nationwide. Letter from Douglas

W. Elmendorf, Director, CBO, to Rep. Darrell E. Issa, Chairman, House Committee on Oversight and Government Reform (Dec. 6, 2012) ("To the best of our recollection, the possibility that those subsidies would only be available in states that created their own exchanges did not arise during the discussions CBO staff had with *a wide range of Congressional staff* when the legislation was being considered." (emphasis added)).

The truth is that there is nothing in the record indicating that, aside from wanting to afford States *flexibility*, Congress preferred State-run to HHS-run Exchanges. Appellants have not explained why Congress would want to encourage States to operate Exchanges rather than the federal government doing so, nor is there any indication that Congress had this goal. "[T]he purpose of the tax credits was not to encourage States to set up their own Exchanges. Indeed, making the tax credits conditional on state establishment of the Exchanges would have empowered hostile state officials to undermine the core purpose of the ACA, a result that [the] architects of the ACA wanted to avoid, not encourage." Br. for Members of Congress and State Legislatures at 22.

Furthermore, Appellants assume without any basis that denying taxpayers premium subsidies would put political pressure on States to create Exchanges. This assumption runs counter to Appellants' own theory of harm: After all, Appellants object to the subsidies because they impose additional financial obligations on individuals and employers by triggering the individual mandate and assessable payments for employers. These obligations would not attach if the subsidies were not available in the State. Because the subsidies trigger additional costs for individuals and employers, it is not obvious that they would be popular among taxpayers or cause taxpayers to pressure their States to create Exchanges.

The single piece of evidence that Appellants cite to support their claim that Congress intended to restrict subsidies to State-run Exchanges is an article by a law professor. Br. for Appellants at 40 (citing Timothy S. Jost, *Health Insurance Exchanges: Legal Issues*, O'Neill Inst., Georgetown Univ. Legal Ctr., no. 23 (Apr. 7, 2009)). There is no evidence, however, that anyone in Congress read, cited, or relied on this article.

## III. CONCLUSION

The Supreme Court has made it clear that "[t]he plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson*, 519 U.S. at 341. We cannot review a "particular statutory provision in isolation . . . . It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Nat'l Ass'n of Home Builders*, 551 U.S. at 666. Following these precepts and reading the ACA as a whole, it is clear that the statute does not unambiguously provide that individuals who purchase insurance from an Exchange created by HHS on behalf of a State are ineligible to receive a tax credit. The majority opinion evinces a painstaking effort – covering many pages – attempting to show that there is no ambiguity in the ACA. The result, I think, is to prove just the opposite. Implausible results would follow if "established by the State" is construed to exclude Exchanges established by HHS on behalf of a State. This is why the majority opinion strains fruitlessly to show plain meaning when there is none to be found.

The IRS's and HHS's constructions of the statute are perfectly consistent with the statute's text, structure, and purpose, while Appellants' interpretation would "crumble" the Act's structure. Therefore, we certainly cannot hold that that the agencies' regulations are "manifestly contrary to the statute." This court owes deference to the agencies' interpretations of the ACA. Unfortunately, by imposing the Appellants' myopic construction on the administering agencies without any regard for the overall statutory scheme, the majority opinion effectively ignores the basic tenets of statutory construction, as well as the principles of *Chevron* deference. Because the proposed judgment of the majority defies the will of Congress and the permissible interpretations of the agencies to whom Congress has delegated the authority to interpret and enforce the terms of the ACA, I dissent.